ALASKA STATE SNOWMOBILE
ASSOCIATION, INC., et al.,
Plaintiffs,

v.

Bruce BABBITT, Secretary of
the United States Department
of Interior, et al., Defendants,

v.

The Wilderness Society, et al.,
Defendant–Intervenors and
Cross–Claimants.

No. A99–059 CV(JWS).

United States District Court,
D. Alaska.

Nov. 8, 1999.

## ORDER FROM CHAMBERS
[Re: Motions and Cross–Motions
for Summary Judgment;
Dockets 22, 23, and 31]

SEDWICK, District Judge.

### I. PRELIMINARY NATURE OF ORDER

At docket 22, defendant-intervenors The Wilderness Society, *et al.* ("Wilderness Society") move for summary judgment. At docket 23, plaintiffs Alaska State Snowmobile Association, Inc., *et al.* ("ASSA") move for summary judgment. At docket 31, defendants Bruce Babbitt, *et al.* ("Babbitt") move for summary judgment. The motions are opposed. Oral argument is scheduled for November 12, 1999. The purpose of this preliminary order is to express the court's tentative views regarding how the motions should probably be resolved in the expectation that this will assist the parties prepare for and conduct oral argument. This preliminary order does not represent the court's final order. The court may or may not adopt this preliminary order as its final order depending upon oral argument.

### II. BACKGROUND

#### A. The Litigation

Effective on or about February 4, 1999,[1] the United States National Park Service ("Park Service") closed a portion of the Denali National Park and Preserve ("Denali National Park") to the operation of snowmachines for traditional activities for a period of twelve months while leaving two corridors in the park open for such uses ("Decision"). ASSA filed suit alleging that the Decision unlawfully restricted snowmachine use in Denali National Park.. ASSA asks the court to declare that the Decision violates applicable provisions of the Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101 *et seq.* ("ANILCA"),[2] the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), and the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.* ("APA") Plaintiffs also seek an injunction prohibiting Babbitt from closing the park to snowmachine operations for traditional activities in violation of ANILCA, NEPA, APA and Park Service regulations.[3]

Wilderness Society intervened as a defendant to oppose ASSA and to assert cross-claims against Babbitt alleging that the Decision unlawfully opened a portion of the park to snowmachine use in violation of various provisions of federal law, including provisions of ANILCA, NEPA, APA and the Wilderness Act, 16 U.S.C. §§ 1131 *et seq.* ("WA").

#### B. History of Snowmachine Regulation in the Park

A brief review of certain legislative enactments and the Park Service's management of the park is necessary to place this tri-partite dispute in context. Mount McKinley National Park was established by Congress in 1917.[4] It was to be used

1. The Statement of Findings recites that the closure is effective on the date of the document's execution. The document bears two signatures, a recommendation signed by the Superintendent on February 3, 1999, and an approval signed by the Alaska Regional Director. Curiously, the approval is dated February 2, 1999, a day earlier than the recommendation. Administrative Record ("AR"), vol. I, tab 20 at 290. The official press release which is dated February 4, 1999, recites that the closure action was taken "today." AR vol. 1, tab 21 at 305.

2. ANILCA was enacted as Pub.L. 96–487, Dec. 2, 1980, 94 Stat. 2377–2551. Some sections of ANILCA are codified elsewhere, including 16 U.S.C. §§ 410hh–410hh–5.

3. Docket 1 at p. 39.

4. 16 U.S.C. § 347.

for public recreation and preservation purposes.[5] In 1980, ANILCA added approximately 3.75 million acres and designated the original park with its new addition Denali National Park and Preserve.[6] The original park is often referred to as the "Old Park" or the "core" of the park. ANILCA also classified the newly enlarged park as a "conservation system unit" ("CSU").[7]

ANILCA specifically addresses the use of snowmachines within CSUs:

> **Notwithstanding any other provision of this Act or other law, the Secretary shall permit, on conservation system units,** national recreation areas, and national conservation areas, and those public lands designated as wilderness study, **the use of snowmachines (during periods of adequate snow cover, or frozen river conditions in the case of wild and scenic rivers),** motorboats, airplanes, and nonmotorized surface transportation methods **for traditional activities (where such activities are permitted by this Act or other law) and for travel to and from villages and homesites. Such use shall be subject to reasonable regulations by the Secretary to protect the natural and other values of the conservation system units,** national recreation areas, and national conservation areas, and **shall not be prohibited unless, after notice and hearing in the vicinity of the affected unit or area, the Secretary finds that such use would be detrimental to the resource values of the unit or area.** Nothing in this section shall be construed as prohibiting the use of other methods of transportation for such travel and activities on conservation system lands where such use is permitted by this Act or other law.[8]

ANILCA thus established an "open until closed" policy regarding snowmachine use for traditional activities within Denali National Park. Acting pursuant to the statutory grant of authority, the Secretary promulgated a regulation addressing snowmachine use in Denali National Park in 1986. The regulation in question, codified at 43 C.F.R. § 36.11, became effective on October 6, 1986. It provides:

> **The use of snowmachines (during periods of adequate snow cover and frozen river conditions) for traditional activities (where such activities are permitted by ANILCA or other law)** and for travel to and from villages and homesites and other valid occupancies **is permitted within such areas,** except where such use is prohibited or otherwise restricted by the appropriate Federal agency in accordance with the procedures of paragraph (h) of this section.[9]

The regulation does not define "traditional activities." It does provide for closure of lands to snowmachine use:

> (1) The appropriate Federal agency may close an area on a temporary or permanent basis to use of aircraft, snowmachines, motorboats or nonmotorized surface transportation only upon a finding by the agency that such use would be detrimental to the resource values of the area.

> (2) Temporary closures. (i) Temporary closures shall not be effective prior to notice and hearing in the vicinity of the area(s) directly affected by such closures and other locations as appropriate. (ii) A temporary closure shall not exceed 12 months.[10]

Shortly after 43 C.F.R. Part 36 was promulgated, suit was filed in this court against the Secretary of the Interior challenging 43 C.F.R. Part 36.[11] No specific

---

5. 16 U.S.C. § 351.

6. 16 U.S.C. § 410hh–1(3)(a).

7. 16 U.S.C. § 3102(4).

8. 16 U.S.C. § 3170(a) (emphasis added).

9. 43 C.F.R. § 36.11(c) (emphasis added).

10. 43 C.F.R. § 36.11(h).

11. *Trustees for Alaska et al. v. United States Dep't of the Interior, Donald Hodel, Secretary,* A87–055 CV (JKS).

challenge was made to 43 C.F.R. § 36.11(c) or to snowmachine use in Denali National Park. Magistrate Judge Roberts issued a report and recommendation upholding the regulations.[12] District Judge Singleton adopted the report and recommendation with only slight modification.[13] In April 1991, Judge Singleton remanded certain issues to the Department of the Interior for purposes of having the Department provide a more complete explanation of action taken by the Department in promulgating its regulations. The court retained jurisdiction for six months pending a status report from the Department. The case was finally dismissed and a final judgment entered in favor of the Department on March 16, 1993.[14]

Notwithstanding ANILCA and the regulation adopted in 1986, the Park Service never officially sanctioned snowmachine use in the Old Park until the Decision declared that certain areas were open.. Appendix B to the Park Service's Statement of Finding candidly admits that, "[the Park Service] has managed the [Old Park] as being closed to the use of snowmachines for the 10 years prior to enactment of [ANILCA] and for the 18 years since."[15] The statement is consistent with many earlier pronouncements by the Park Service.

In 1979, a year before ANILCA's enactment, the Park Service emphasized that "[s]nowmobiling is prohibited in Mt. McKinley National Park."[16] On June 28, 1988, the Park Superintendent issued an order governing Denali National Park which specified that "[t]he use of snow machines in the [Old Park], and parts of the park additions and preserves is not traditional, and is not allowed."[17] In November 1992, over six years after 43 C.F.R Part 36 was promulgated, the Park Superintendent issued an order defining "traditional activity" to be "an activity that was regularly practiced in the former Mt. McKinley National Park prior to the 1980 passage of ANILCA."[18] The Superintendent concluded that "[t]he use of snowmachines does not fit this definition [regarding traditional activity in the Old Park]. Therefore, they are not allowed."[19] However, the Superintendent decided that "[a]ll new areas included in the 1980 park additions are available to snow machine use during times of adequate snow cover."[20] In March 1993, the Park Service issued a news release which specified that snowmachines were "not permitted in the wilderness area that coincides with the old Mount McKinley National Park."[21] On April 18, 1996, the Park Service updated its compendium of rules governing Denali National Park. As updated, the rules provided:

> This applies to the new park and preserve areas added by the passage of ANILCA. Recreational snowmachine use has no historical basis for establishing a tradition of recreational use in the former Mt. McKinley National Park. Therefore, it remains a prohibited activity. No enforcement action other than education should be pursued dealing with snowmachines in the former Mt. McKinley National Park under this section. A draft special regulation has been written prohibiting this activity and forwarded to the Alaska Regional Office for review and refinement.[22]

12. Report and Recommendation, January 14, 1989 (submitted as exhibit 5 at docket 31).

13. Order, April 29, 1991 (submitted as exhibit 29 at docket 36).

14. Final Judgment, March 16, 1993 (submitted as exhibit 6 at docket 31).

15. AR vol. I, tab 20 at 300.

16. AR vol. X at 3.

17. AR vol. XI, tab 12 at 52–53.

18. AR vol. X, tab 6 at 20.

19. *Id.*

20. *Id.*

21. AR vol. X, tab 7 at 26.

22. AR vol. IX, tab 14 at 57.

## C. The Challenged Decision

Curiously, despite the fact that it had never officially sanctioned snowmachine use in Denali National Park, the Park Service announced on November 10, 1998 that it intended to temporarily close the Old Park to snowmachine use.[23] It appears that the Park Service may have taken this action because of concerns that it was not correctly interpreting ANILCA. Specifically, the Park Service may have reached the conclusion that snowmachine use, on its own, did not have to be a traditional activity so long as it was used for access to engage in traditional activities.[24] Alternatively, the Park Service may simply have concluded that it should effect any closure under ANILCA rather than by relying on historical management practices reflected in its compendium of park rules. At a public hearing held in Anchorage, Alaska on November 25, 1998, Steve Martin, Superintendent of Denali National Park, explained why the Park Service was proceeding with a temporary closure:

QUESTION (By Mr. Limeres): Well, yeah, I'm just real—still not clear on what prompted this whole thing. Was it because you had pressure from certain groups to reexamine the whole thing or what?

ANSWER (By Mr. Martin): Okay, the question is, and that's a good point and I think one of our handouts addresses that, too, but is: Why now? And again, the reason that we're going through this process now is we because we have agreed **that the proper way to continue the closure of the old Park** to snowmachining is to not use the Superintendent's Compendium, but to utilize the regulations that were set up after AN-ILCA was put in place. Again, that's the 36 C.F.R. § 1330 and 43 C.F.R. that specifically talk about closures of the ANILCA related areas. To utilize that process to do the closure as opposed to the Superintendent's Compendium or other general authorities. And following—and again, so that's the purpose of it. **So it's a regulatory issue of how to continue the longstanding closure.**[25]

Whatever the reason for deciding to temporarily prohibit the use of snowmachines in an area that the Park Service already considered closed to snowmachine use, the Park Service did discuss the historic prohibition on snowmachines in the Old Park in its notice announcing the temporary closure,:

The legal use of mechanized equipment for winter recreation by the general public never occurred in the core 2 million acres of Denali National Park and Preserve from 1917 to 1980. In fact, this portion of the park (former Mt. McKinley National Park) was specifically closed to public recreational snowmachine use by a nationwide regulation in 1972. This closure was in direct response to the increasing use of snowmachines and a growing concern from the public about their impacts to the resources and other values of park areas.[26]

Before making the Decision, the Park Service gave notice that public hearings would be held between November 22–25, 1999 to address the planned closure.[27] The Park Service's press release issued on November 10, 1998, announced that the Park Service was "establishing temporary regulations to maintain the closure of a portion of Denali National Park and Preserve to snowmachine use this winter."[28]

---

23. AR vol. I, tab 1.

24. *See, e.g.,* AR vol. I, tab 20 at 272 (recognizing that ANILCA guarantees that "various means of access, including snowmobiles, shall be allowed for conducting traditional activities, *subject to reasonable regulation, in the interest of protecting natural and other values.*").

25. AR vol. VIII, tab 3 at 135 (emphasis added).

26. AR vol. I at 3.

27. *See* AR vol. IX, tab 16 at 248 (11/10/1998 press release); *see also* docket 28, tab 5 (notice published in "The Anchorage Daily News").

28. AR vol. IX, tab 16 at 248.

The Park Service emphasized that the temporary closure was a "continued closure" and advised that "[t]he original Mount McKinley National Park, most of which was designated as wilderness by ANILCA, has never been open to snowmachines." [29] The notice published in statewide newspapers also advised that snowmachines had always been prohibited in the Old Park, but that the "current rules are inadequate to legally maintain this 81-year tradition." [30] The notice explained that public hearings would be held to "inform the public of the nature and extent of the closures, gather information on concerns of effects on park resources, and collect information on any traditional snowmachine activity (that occurred before 1980) in the areas of the closure." [31] The notice said the action was taken to maintain the status quo and effectively advised interested parties that a decision to close the area had already been made: "This closure will begin December 1, 1998 and will be in effect for one year." [32]

ASSA protested the "proposed" closure, urging that under ANILCA, the Park Service could not close the Old Park to snowmachine use without a finding of resource detriment. [33] The record before the court does not reveal whether the Park Service ever responded to ASSA's letter, but the Park Service proceeded with its scheduled public hearings in Fairbanks, [34] Mt. McKinley Village, [35] the Talkeetna area, [36] and Anchorage. [37] At the public hearings, Martin described the temporary closure as "a continuation of a tradition of non motorized use within the old part of Denali National Park." [38] Stressing that the temporary closure was "just to maintain the status quo in the old park," [39] Martin candidly admitted the decision had already been made to effect a temporary closure, and that the decision would not be reversed no matter what the testimony at the public hearings:

QUESTION (By Mr. Rawlins): Can I ask one more question? There's four public hearings. Correct?

ANSWER (By Mr. Martin): Yes.

Q (Rawlins): No matter what is—what the testimony is at the four public hearings, no matter what's—whoever speaks, it doesn't matter who it is, there's still going to be a closure?

A (Martin): There will be some type of closure, yes. And I think what we're listening to now is traditional uses of the areas, the effects on resources, the conflicts and basically how to hold the status quo. So, it is our plan to do a level of closure to preserve the status quo so that we can work together and plan how the area should be used by all the users. [40]

**29.** *Id.*

**30.** Docket 28, tab 5 (notice published in "The Anchorage Daily News" on 11/11/1998).

**31.** *Id.*

**32.** *Id.*

**33.** Docket 28, tab 3 (ASSA letter of December 10, 1998).

**34.** AR vol. VIII, tab 4.

**35.** AR vol. VIII, tab 2.

**36.** AR vol. VIII, tab 1.

**37.** AR vol. VIII, tab 3. In addition to conducting public hearings, the Park Service solicited written comments. Fourteen-hundred forty-two written comments were received from across the United States, of which 470 were received from Alaskans. The responses from all citizens, including Alaskans, were overwhelmingly in favor of the closure. AR vol. I, tab 20 at 286.

**38.** AR vol. VIII, tab 4 at 232 (11/22/1998 public hearing at Fairbanks, Alaska); *see also* AR vol. VIII, tab 4 at 231, 235, 325 (11/22/1998 public hearing at Fairbanks, Alaska); AR vol. VIII, tab 2 at 61–62 (11/23/1998 public hearing at Mt. McKinley Village, Alaska); AR vol. VIII, tab 1 at 5 (11/24/1998 public hearing at Susitna Valley High School); AR vol. VIII tab 3 at 132–33, 135–36, 137 (11/25/1998 public hearing at Anchorage, Alaska).

**39.** AR vol. VIII, tab 4 at 235.

**40.** AR vol. VIII, tab 4 at 325–36.

The Decision rests on a finding that snowmachine use in the Old Park would lead to resource detriment.[41] However, the Park Service determined that two corridors within the Old Park would be open to snowmachine use: (1) Cantwell Creek and (2) the Easy Pass area between Bull River and the West Fork of the Chulitna River.[42] The Park Service stated that one of the reasons for the temporary closure was to provide additional time to develop more information concerning the effects of snowmachine use.[43]

## III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact.[44] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[45] Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[46] All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[47] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[48]

## IV. DISCUSSION

### A. Article III Standing

Under Article III of the United States Constitution, this court's judicial power is limited to hearing actual cases or controversies. Babbitt argues that all plaintiffs and defendant-intervenors lack Article III standing. Article III standing requires actual or threatened injury, traceable to the allegedly unlawful conduct, which may be redressed by the requested relief.[49] In particular terms, Article III standing requires:

> (1) that the plaintiff have suffered an "injury in fact"[-] an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[50]

In addition to these constitutional prerequisites, certain prudential concerns affect standing. With the exception of representational or associational standing, a litigant may not assert legal rights belonging to another person. Furthermore, the claim must fall within the "zone of interests" covered by the law invoked.[51]

**41.** AR vol. I, tab 20 at 276–85.

**42.** AR vol. I, tab 20 at 288.

**43.** AR vol. I, tab 20 at 269, 288–89.

**44.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**45.** *Id.* at 323–325, 106 S.Ct. 2548.

**46.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–9, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**47.** *Id.* at 255, 106 S.Ct. 2505.

**48.** *Id.* at 248–49, 106 S.Ct. 2505.

**49.** *Central Arizona Water Conserv. Dist. v. United States*, 990 F.2d 1531, 1537 (9th Cir. 1993).

**50.** *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1157 (9th Cir.1998) (quoting *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997)).

**51.** *Id.*

### 1. *Plaintiffs' Standing*

■ Plaintiffs have filed affidavits adequately establishing that they have used and, but for the Decision, would have continued using snowmachines in areas of the Old Park closed by the Decision.[52] Plaintiffs' affidavits show an injury to a judicially cognizable interest [53] which is concrete and particularlized, actual or imminent, not conjectural or hypothetical, which is caused by the Decision, and which would be directly redressed by the relief sought. Indeed, Babbitt's reply concedes that in light of the submitted affidavits, the plaintiffs "appear to satisfy the requirements of standing." [54] Plaintiffs do not indulge in an improper assertion of the rights of others, and their claims clearly fall within a zone of interest addressed in ANILCA, APA and somewhat less clearly within NEPA's zone of interest.[55]

■ Nevertheless, Babbitt contends plaintiffs' claims should be dismissed because they did not submit affidavits with their complaint or their motion for summary judgment. Babbitt cites no authority for his argument. Of course, plaintiffs must allege and establish standing,[56] but there is no specific requirement that plaintiffs file detailed affidavits in advance of an opponent's motion for summary judgment.

As Justice Scalia noted in one recent case, after an opponent has moved for summary judgment, a plaintiff "can no longer rest on ... 'mere allegations,' [to establish standing] but must 'set forth' by affidavit or other evidence 'specific facts,' Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." [57] Here, Babbitt moved for summary judgment on grounds including the proposition that plaintiffs lack standing. Plaintiffs submitted particularized affidavits in response. While it would have been preferable for plaintiffs to have submitted the affidavits with their motion, the practice followed is adequate, and certainly not a basis for dismissing plaintiffs' claims. Plaintiffs have standing.

### 2. *Defendant–Intervenors' Standing*

### (a) *Representational or Associational Capacity Standing*

■ Unlike the group of plaintiffs, the group of defendant-intervenors does not include any individuals. However, defendant-intervenors may have standing in a representational or associational capacity if their respective members would have standing, they seek to protect interests germane to their organizational purposes, and individual members' participation as named litigants is not required to properly resolve the litigation.[58] Defendant-inter-

**52.** Docket 35, exh. 1 – 4, Affidavits of Linnea Crosby, Vernon J. Carlson, Joseph R. Gauna, and Kevin Hite.

**53.** ANILCA guarantees the right to use snowmachines in CSUs for traditional activities. It may be noted that the court is not now holding that any of the particular activities for which plaintiffs aver they use snowmachines is, in fact, a traditional activity. However, the Park Service's failure to define "traditional activities" makes it impossible for the court to hold now that "sightseeing, experiencing solitude, practicing photography, and enjoying backcountry camping, the wilderness experience, and other traditional activities," (docket 35, exh. 1) do not embrace at least one "traditional activity" within the meaning of ANILCA.

**54.** Docket 44 at 2.

**55.** Plaintiffs' affidavits claim that their use of the park is to enjoy the scenic wonders of the wilderness, *e.g.,* docket 36, exh. 2, affidavit of

Vernon J. Carlson at para. 4. The snowmobile association also claims as one purpose "the protection of the environment from irreparable harm." Docket 36, exh. 4, affidavit of Kevin Hite. Although it is obvious that plaintiffs have another purpose, *viz.* enjoying snowmobiling, a commitment to use the environment responsibly for human enjoyment brings plaintiffs within NEPA's zone of interest. *Presidio,* 155 F.3d at 1158.

**56.** *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561–62, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992).

**57.** *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2137.

**58.** *Presidio,* 155 F.3d at 1159. Plaintiff snowmobile association has representational standing based upon the standing of the individual plaintiffs Crosby, Carlson, and Gauna who are members of the association.

venors have submitted declarations from members.[59] Several of them address injuries allegedly suffered by the organizations themselves.[60] Standing based on organizational capacity is analyzed in the next section. Others of the declarations which attempt to set out injuries suffered by individual members of some of the defendant-intervenors [61] are considered in this section addressing the organizations' representational standing.

█ Babbitt argues that the declarations submitted to establish injury to individual members are too generalized and speculative to satisfy the injury requirement of standing. A review of the relevant declarations is in order. James Adams, president of the Alaska Quiet Rights Coalition, submits a declaration that advises "[m]embers of Alaska Quiet Rights Coalition have used and plan to return to the areas impacted by the Park Service's Statement of Findings." [62] The declaration is bereft of specifics regarding the nature, extent, time and place of the use. Debra Moore, campaign coordinator for the Northern Alaska Environmental Center, submits an identical declaration in which she advises that "[m]embers of Northern Alaska Environmental Center have used and plan to return to the areas impacted by the Park Service's Statement of Findings." [63] Like Adams, Moore offers no other information. No identities are disclosed. No time of travel is mentioned. No specific facts are offered. Compare the affidavit of plaintiff Linnea Crosby who avers that she has been riding snow machines in areas of the Old Park which she specifically identifies and which are in the area affected by the Decision for specifically identified purposes for a period of ten years and would have continued to do so, but for the Decision. Adams' and Moore's declarations are not sufficient to establish injury in fact.

█ Joan Pascale, a member of the National Parks and Conservation Association, submits two declarations in which she declares that she has mushed dog sleds through the area impacted by the Decision.[64] Although Pascale does not specifically state that she intends to revisit the two areas where the Park Service has permitted snowmachine use, a fair reading of her April 6, 1999, declaration reveals that when she made the declaration she had plans to return to those areas: "The introduction of snowmachines to the Old Park, including Cantwell Creek and in the valleys of and over Easy Pass between Bull River and the West Fork of the Chulitna River, will injure my aesthetic, recreational, and wildlife viewing interests while I spend time in the Old Park." [65] Thus, her April 6, 1999 declaration appears adequate to establish her standing to challenge the Decision, but her subsequent declaration executed September 17, 1999, explains that she does not intend to use the park this year [66] during the pendency and effect of the Park Service's temporary closure order. Taken together, Pascale's declarations are insufficient to confer standing to challenge the temporary closure order, because it will expire ere she returns to the park.

█ Scott Anaya, a Sierra Club member, submits a declaration in which he

59. Docket 36, exh. 13–28, declarations of Allen E. Smith, Chip Dennerlein, Jack Hession, Charles Clusen, Frankie Barker, Paul Joslin, Henry Friedman, James Adams, Debra Moore, Joan Pascale, Ginny Hill Wood, Larry Landry, Scott Anaya, Jon M. Nierenberg, and Karen Deatherage.

60. Docket 36, exh. 13–19.

61. Docket 36, exh. 20–28.

62. Docket 36, exh. 20, declaration of James Adams, ¶ 4 at 1.

63. Docket 36, exh. 21, declaration of Debra Moore, ¶ 5 at 1.

64. Docket 36, exh. 22, declaration of Joan Pascale, April 6, 1999 (note that p. 2 of this exhibit is misidentified as exhibit 23); docket 36, exh. 23, declaration of Joan Pascale, September 17, 1999.

65. Docket 36, exh. 22, Pascale declaration of April 6, 1999, ¶ 11 at 2.

66. Docket 36, exh. 23, Pascale declaration of September 17, 1999, ¶ 5 at 1–2.

states that he "hopes" to ski in the Cantwell Creek area this winter.[67] Anaya's declaration is little different from the affidavits analyzed by the United States Supreme Court in *Lujan v. Defenders of Wildlife*.[68] There, the Court held deficient two affidavits which did nothing more than establish that two individuals possessed an indefinite intent to visit a particular region overseas at some unspecified time in the future.[69] This is essentially the same as Anaya's expressed "hope" to visit the affected area this winter. Such an indefinite statement of intent is insufficient to establish injury in fact.

■ Other declarations which discuss personal use of land in the park are those from Virginia (Ginny) Hill Wood, Larry Landry, Jon M. Nierenberg, and Karen L. Deatherage.[70] All four of these declarations allege general use of land in Denali National Park. However, at face value none of these declarations alleges use or enjoyment of land in any of the specific areas opened to snow machine use by the Decision or even, so far as the record available to the court discloses, in the immediate vicinity of such lands. The fact that Wood, Landry, Nierenberg, and Deatherage have occupied, used, or enjoyed land somewhere in Denali National Park is not sufficient to establish injury in fact. In *Lujan v. National Wildlife Federation*,[71] the United States Supreme Court held that affidavits from individuals which established that they used or enjoyed land for recreational and aesthetic purposes in the vicinity of land affected by agency action was not sufficient to confer standing.[72] Geographic nexus may suffice to establish standing where, as here, procedural rights are at stake if concrete injury can be established. For example, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement."[73] However, beyond generally vague allusions, Wood, Landry, Nierenberg, and Deatherage have not specified a sufficient geographic nexus to establish a concrete injury to protected rights.

The individual members lack standing. It follows that none of defendant-intervenors have Article III standing to sue in a representational capacity.

### (b) Organizational Capacity Standing

Defendant-intervenors have submitted numerous declarations addressing standing in each organization's organizational capacity. The declarations are substantially similar, if not identical. They allege that the Park Service's decision to permit snowmachines in Cantwell Creek and in the Easy Pass area between Bull River and the West Fork of the Chulitna River will irreparably injure the wilderness and wildlife in the area.[74] The declarations allege in a conclusory fashion that the Park Service's decision violates ANILCA, the Wilderness Act, the APA, and NEPA.[75] The declarations allege that the Park Service's decision has adversely affected each organization's ability to protect wildlife and the wilderness.[76] The preced-

---

**67.** Docket 36, exh. 26, declaration of Scott Anaya at 1.

**68.** 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

**69.** *Defenders of Wildlife*, 504 U.S. at 563–64, 112 S.Ct. at 2138–39.

**70.** Docket 36, exh. 24, declaration of Virginia (Ginny) Hill Wood, ¶¶ 2–7 at 1–3; exh. 25 Declaration of Larry Landry; exh. 27, declaration of Jon M. Nierenberg; exh. 28, declaration of Karen L. Deatherage.

**71.** 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

**72.** *National Wildlife Federation*, 497 U.S. at 885–89, 110 S.Ct. at 3187–89.

**73.** *Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7.

**74.** *See, e.g.,* docket 36, exh. 13, declaration of Allen Smith, ¶ 4 at 1.

**75.** *Id.,* ¶ 5 at 1–2.

**76.** *Id.,* ¶ 6 at 2.

ing averments are conclusory, generalized statements which are insufficient to establish standing.

There is an additional theory which requires more thorough analysis. The declarations contend that the Park Service's failure to comply with NEPA injures each organization's "informational and educational interests." [77] Each organization contends that it was prevented from educating "its members and the public regarding the true environmental effects of snowmachines in the Old Park" [78] because the Park Service did not prepare an environmental assessment or prepare an environmental impact statement. This theory is relevant to Wilderness Society's fourth and fifth cross-claims concerning alleged NEPA violations. [79]

Wilderness Society contends "informational standing" is authorized by a recent United States Supreme Court decision, *Federal Election Commission v. Akins.*[80] At issue in *Akins* was a decision by the Federal Election Commission that a particular lobbying group was not a political action committee as defined under federal law. Because of this decision, information regarding members and campaign contributions made by the lobbying group was not disclosed. The United States Supreme Court held that this type of injury satisfied the injury in fact test for Article III standing. Justice Breyer explained:

> The "injury in fact" that respondents have suffered consists of their inability to obtain information—lists of AIPAC donors (who are, according to AIPAC, its members), and campaign-related contributions and expenditures—that, on respondents' view of the law, the statute requires that AIPAC make public. There is no reason to doubt their claim

that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election. Respondents' injury consequently seems concrete and particular. Indeed, this Court has previously held that a plaintiff suffers an "injury in fact" when the plaintiff fails to obtain information which must be publicly disclosed pursuant to statute.[81]

However, the "informational injury" theory raised in *Akins* is somewhat different from that relied upon here. As underscored by Justice Breyer's opinion, *Akins* concerned existing information "which must be publicly disclosed pursuant to statute." Here, in contrast, public disclosure of existing information is not involved. Furthermore, the information sought in *Akins* was the only available source by which the plaintiffs could fulfill their mission. Here, in contrast, nothing prevents the defendant-intervenors from educating the public concerning snowmachine use in the Old Park. Moreover, as Babbitt notes, *Akins* arose in the unique and special context of voters' rights, and its holding was no doubt affected by the fact that the informational injury was "directly related to voting, the most basic of political rights...." [82] No such unique or special context is implicated in this case.

Wilderness Society cites no cases recognizing an "informational standing" theory in the context of a NEPA claim. In *Northern Alaska Environmental Center v. United States Army Corps of Engineers,*[83] this court in an order by Judge Holland

---

**77.** *Id.,* ¶ 7 at 2.

**78.** *Id.*

**79.** *See* Answer and Cross–Claims of Defendant–Intervenors, filed April 29, 1999, docket 7 ¶ 73 at 36, ¶ 79 at 37.

**80.** 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998).

**81.** *Akins,* 524 U.S. at 21, 118 S.Ct. at 1784.

**82.** *Akins,* 524 U.S. at 24–25, 118 S.Ct. at 1786.

**83.** A98–217 CV (HRH).

did not find it necessary to address a similar "informational standing" argument.[84] The case most cited by courts and commentators addressing "informational standing" is *Foundation of Economic Trends v. Lyng*,[85] where the Court of Appeals for the District of Columbia analyzed competing principles and expressed its disapproval of "informational standing" theories. The court observed:

Despite the general statements in our decisions ... **we have never sustained an organization's standing in a NEPA case solely on the basis of "informational injury,"** that is, damage to the organization's interest in disseminating the environmental data an impact statement could be expected to contain. We recognize the logical appeal of doing so in terms of the three constitutional standing requirements: if the injury in fact is the lack of information about the environmental impact of agency action, it follows that the injury is caused by the agency's failure to develop such information in an impact statement and can be redressed by ordering the agency to prepare one. **Such a broad approach, however, raises "complex and difficult considerations." It would potentially eliminate any standing requirement in NEPA cases, save when an organization was foolish enough to allege that it wanted the information for reasons having nothing to do with the environment.** The proposition that an organization's desire to supply environmental information to its members, and the consequent "injury" it suffers when the information is not forthcoming in an impact statement, establishes standing without more **also encounters the obstacle of Sierra Club v. Morton. The Supreme Court there held ... that "a mere 'interest in a problem,' no matter how long-standing the interest and**

**no matter how qualified the organization is in evaluating the problem," is not sufficient to confer standing.** It is not apparent why an organization's desire for information about the same environmental problem should rest on a different footing. We also have trouble seeing how "informational standing" could be confined to organizations. If one of NEPA's purposes is to provide information to the public, any member of the public—anywhere—would seem entitled to receive it.[86]

However, the court found it unnecessary to decide whether an organization could satisfy Article III's "case or controversy" requirement by relying on an "informational standing" theory because the plaintiffs "fail[ed] to target their complaint to a particular proposal for federal action and fail[ed] to identify any [action] ... that would trigger the obligation to prepare an environmental impact statement under NEPA." [87]

One district court in the Ninth Circuit recently addressed and rejected a similar "informational standing" theory in the context of a Clean Water Act claim. In *Ecological Rights Foundation v. Pacific Lumber Co.*,[88] the Ecological Rights Foundation filed suit against a lumber company for alleged violations of the Clean Water Act. The court denied plaintiffs standing on the basis of an "informational standing" theory, noting:

Plaintiffs must establish that they have either associational or organizational standing to sue in order to invoke this court's jurisdiction. Plaintiffs initially assert that they have organizational standing because [the lumber company's] failure to comply with the monitoring and reporting requirements of the Act has impeded their programmatic in-

---

84. Order, filed April 19, 1999, docket 78 at 8 n. 8 (submitted as exhibit 10 at docket 31).

85. 943 F.2d 79 (D.C.Cir.1991).

86. *Foundation on Economic Trends*, 943 F.2d at 84–85 (citations omitted) (emphasis added).

87. *Foundation on Economic Trends*, 943 F.2d at 86.

88. 61 F.Supp.2d 1042 (N.D.Cal.1999).

terest in educating the public about environmental issues and seeking redress for environmental destruction through the courts. However, this court has found no case law which supports plaintiffs' contention that injury to an organization's informational interests alone resulting from a defendant's failure to comply with monitoring and reporting requirements of the CWA satisfies Article III standing requirements.[89]

Although not directly on point, *Pacific Lumber* offers additional support for Babbitt's position here. If Wilderness Society were correct, then advocacy organizations and societies would always enjoy "informational standing" anytime an alleged NEPA violation occurred. This seems unlikely in light of established precedent. In *Sierra Club v. Morton*,[90] the United States Supreme Court held that "a mere 'interest in a problem,' no matter how long-standing the interest and no matter how qualified the organization is in evaluating the problem," is not enough to confer standing.[91] More recently, in *Lujan v. Defenders of Wildlife*,[92] the United States Supreme Court rejected an argument that procedural injury on its own conferred standing.[93] Instead, the Court stressed that concrete and particularized harm would have to be established. Analyzing *Lyng*, one court commented that "[t]he Supreme Court's subsequent decision in Lujan v. DOW implicitly confirms that the Court of Appeals in Lyng correctly analyzed the question of standing based on informational harm

alone" because "[t]he concept of standing based only on informational harm is inconsistent with this requirement [of establishing concrete and particularized harm]."[94] The *Defenders of Wildlife* Court also observed that a "plaintiff raising only a generally available grievance—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."[95] Here again, "[t]his principle would be substantially undermined if informational harm alone were deemed sufficient to confer standing."[96]

One case from the District of Columbia Circuit which preceded *Lyng, National Wildlife Federation,* and *Defenders of Wildlife* can be read to support an "informational injury" theory of standing.[97] However, this case can no longer be relied upon as sound law in light of the District of Columbia Circuit's subsequent decision in *Lyng,* and the United States Supreme Court's more recent opinions discussed above. At least one commentator has recommended that courts consider and adopt "informational injury" theories of standing within the context of NEPA claims,[98] but this court has found only one court which has done so. In *Colorado Environmental Coalition v. Lujan,*[99] the District Court for the District of Colorado accepted without analysis an argument that "informational

---

89. 61 F.Supp.2d at 1050.

90. 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

91. *Sierra Club,* 405 U.S. at 739, 92 S.Ct. at 1368.

92. 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

93. *Defenders of Wildlife,* 504 U.S. at 571–74, 112 S.Ct. at 2142–43.

94. *Citizens to End Animal Suffering and Exploitation, Inc. v. The New England Aquarium,* 836 F.Supp. 45, 58 (D.Mass.1993).

95. *Defenders of Wildlife,* 504 U.S. at 573–74, 112 S.Ct. at 2143.

96. *Citizens to End Animal Suffering,* 836 F.Supp. at 58.

97. *See Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079 (D.C.Cir.1973); *see also* Daniel R. Mandelker, *NEPA Law and Litigation,* § 4.06[3][d] at 4–30 – 4–32 (2d ed.1995).

98. *See* Lawrence Gerschwer, "Informational Standing Under NEPA: Justiciability and the Environmental Decisionmaking Process," 93 Colum.L.Rev. 996, 998–99 (1993).

99. 803 F.Supp. 364, 367 (D.Col.1992).

injury" for failure to prepare a supplemental environmental impact statement under NEPA sufficed to establish standing. The court cited *Public Citizen v. United States Department of Justice,*[100] a United States Supreme Court case from 1989, as support for its conclusion. But *Public Citizen* did not involve failure to prepare an EIS under NEPA, and preceded *National Wildlife Federation* and *Defenders of Wildlife.* Nothing in *Public Citizen* is inconsistent with the requirement that one must establish a concrete injury.

Finally, although the parties have not argued the issue, this court has considered whether the defendant-intervenors have "procedural standing" as discussed by Ninth Circuit precedent. Procedural and informational harm are related.[101] In *Douglas County v. Babbitt,*[102] and *Churchill County v. Babbitt,*[103] the Ninth Circuit held that local governments had procedural standing to contest a department's failure to prepare an EIS under NEPA.

At issue in *Douglas County* was a decision by the Secretary of Interior to designate certain lands as a critical habitat without preparing an EA or EIS pursuant to NEPA. The Ninth Circuit concluded that a plaintiff could assert procedural standing if he or she had been "accorded a procedural right to protect [his or her] concrete interests" and if the plaintiff had "some threatened concrete interest ... that is the ultimate basis of [his or her] standing." [104] The court held that Douglas County's proprietary interest in lands immediately adjacent to the critical habitat was sufficient to establish a "concrete interest" affected by failure to prepare an EIS.[105]

In *Churchill County,* local governments filed suit regarding a decision affecting water rights. The Department of Interior prepared a final EIS, but did not prepare a programmatic EIS.[106] Local governments filed suit alleging that failure to prepare a PEIS before implementing the water rights acquisition plan in question violated NEPA.[107] The district court concluded that the local governments lacked standing. The Ninth Circuit reversed. The court explained that when an agency disregarded a procedural right which impacted a concrete interest of the plaintiff's, the plaintiff could maintain standing.[108] The plaintiff was required to establish that it had been accorded a procedural right to protect its concrete interests, and that it had a concrete interest which was threatened and constituted the basis of its standing.[109] The court held NEPA conferred the necessary procedural right, and further determined that Churchill County had a sufficient concrete interest to support standing because the failure to prepare a PEIS affected its interest in land management.[110]

*Douglas County* and *Churchill County* instruct that, in some circumstances, an agency's failure to prepare an EA or EIS pursuant to NEPA may confer standing on a "procedural right" theory where a concrete interest is affected. However, the Ninth Circuit has not held that "informational" interests of the type asserted here constitute a "concrete interest" sufficient to support standing, and in light of *Defenders of Wildlife* and the policy consider-

---

100. 491 U.S. 440, 448–50, 109 S.Ct. 2558, 2563–64, 105 L.Ed.2d 377 (1989).

101. *See, e.g., Citizens to End Animal Suffering, supra,* 836 F.Supp. at 56.

102. 48 F.3d 1495 (9th Cir.1995).

103. 150 F.3d 1072, *modified,* 158 F.3d 491 (9th Cir.1998).

104. *Douglas County,* 48 F.3d at 1500 (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 n. 7, 112 S.Ct. 2130, 2140 n. 7, 119 L.Ed.2d 351 (1992)).

105. *Douglas County,* 48 F.3d at 1501.

106. *Churchill County,* 150 F.3d at 1076.

107. *Id.*

108. *Churchill County,* 150 F.3d at 1077–78.

109. *Id.* at 1078.

110. *Id.*

ations discussed in *Lyng*, it seems unlikely that such a broad, unmanageable theory of standing would be accepted.

■ On the present record, defendant-intervenors have not established specific facts sufficient to establish standing in their organizational capacity.

### B. Statutory Standing

■ Assuming error in this court's analysis of the Article III standing issues, it would be appropriate to address the question whether defendant-intervenors have the requisite statutory standing. Wilderness Society's five cross-claims allege violations of NEPA, ANILCA, WA, and the APA,[111] but Wilderness Society's five cross-claims are all based on alleged violations of 5 U.S.C. § 706 of the APA; that is, Wilderness Society contends that— analyzed in light of NEPA's, ANILCA's, and WA's respective provisions—the Park Service's decision was arbitrary and capricious, represented an abuse of its discretion, and was otherwise not in accordance with the law. 5 U.S.C. § 706 provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.[112]

To establish statutory standing under the APA, Wilderness Society must establish that some identifiable "agency action" has occurred, and that the agency action has caused them to suffer a legal wrong or otherwise adversely affected them "within the meaning of a relevant statute."[113] Failure to act constitutes an identifiable agency action.[114] When, as here, "review is sought under the general review provisions of the APA the agency action must be 'final agency action.'"[115] An agency's characterization of its decision is not determinative.[116] Rather, courts must pragmatically assess the agency's decision in light of several circumstances.[117] Relevant fac-

111. *See* Defendant–Intervenors' Answer and Cross–Claims, filed April 29, 1999, docket 7 at 31–37.

112. 5 U.S.C. § 706.

113. *Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660, 668 (9th Cir.1998) (*citing Lujan v. National Wildlife Federation,* 497 U.S. 871, 882–83, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695 (1990)).

114. *See* 5 U.S.C. § 551(13) (agency action defined as including failure to act); 5 U.S.C. § 706(1) (court empowered to compel agency

to act where it has unlawfully withheld or unreasonably delayed action).

115. *Northcoast Envtl. Ctr.,* 136 F.3d at 668 (citing *National Wildlife Federation* and 5 U.S.C. § 704).

116. *See Carter/Mondale Presidential Comm., Inc. v. Federal Election Comm'n,* 711 F.2d 279, 288 (D.C.Cir.1983).

117. *See FTC v. Standard Oil Co.,* 449 U.S. 232, 239–40, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980).

tors in determining whether an agency action is final include: (1) whether the agency's decision is a definitive statement of the agency's position; (2) whether the agency's decision has a direct and immediate effect on the complaining party's day-to-day affairs; (3) whether the decision has the status of law; (4) whether immediate compliance with the decision is expected; and (5) whether decision implicates legal questions susceptible to review.[118]

Wilderness Society's cross-claims address the Park Service's decision to leave the two corridors open to snowmachine use for traditional activities. However, the two corridors were already open to such use by operation of ANILCA's enactment in 1980. Although the Park Service's previous enforcement policies have varied, the Park Service made no deliberate decision to open an area which was not previously open to snow machine use for traditional activities. The Park Service's decision does not have a direct and immediate effect on defendant-intervenors' day-to-day affairs. The Decision does nothing but maintain the status quo, but that is a status quo rendered murky by the absence of any definition of "traditional activities."

Wilderness Society has recognized what to the court appears to be a glaring omission in the Park Service's analysis in the Third Cross-Claim.[119] Although the cross-claim speaks in terms of an action so vague as to be void, the cross-claim can also be read to complain about a failure to act. Thus, while it is hard to see that defendant-intervenors have standing to complain about the final agency action taken— the Decision itself, it appears to the court that they do have statutory standing to complain of agency action withheld.

In summary, this court concludes that defendant-intervenors lack Article III standing, but if this is incorrect, they would have statutory standing under the APA because their third cross-claim implicates the Park Service's failure to act.

■ Before analyzing ASSA's NEPA and ANILCA claims, this court must ascertain whether ASSA has statutory standing under the APA to pursue its claims. With respect to ASSA's complaint, the Decision constitutes final agency action. A specific and identifiable decision was made to temporarily close the Old Park.[120] The Decision was made pursuant to applicable regulations, and has the status of law.[121] The Park Service expects compliance. The Decision has a direct and immediate effect on ASSA's day-to-day affairs because it prohibits snowmachining in most of the Old Park. The Decision at least arguably triggered an obligation to prepare an EIS. The Decision implicates legal questions susceptible to review such as whether the Decision violates NEPA or ANILCA. Under these circumstances, a "final agency action" susceptible to judicial review exists.

## C. Whether Defendant–Intervenors' Claims are Time Barred

Although this court has concluded that defendant-intervenors lack standing, analysis of their claims is useful in the event that defendant-intervenors are able to persuade this court that its preliminary analysis is incorrect or in the event that on appeal the Ninth Circuit reverses that aspect of this court's order. Before analyzing Wilderness Society's claims, it is necessary to assess two defenses relied upon by Babbitt, the statute of limitation and res judicata. The former is discussed in this section. Babbitt's argument concerning res judicata is reviewed in the following section.

■ Babbitt argues that defendant-intervenors' claims are barred by the statute of limitation Babbitt notes that ANILCA

---

118. *Mt. Adams Veneer Co. v. United States,* 896 F.2d 339, 343 (9th Cir.1989) (*citing FTC v. Standard Oil Co.,* 449 U.S. 232, 239–40, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980)).

119. Docket 8 at p. 34.

120. AR vol. I, tab 20.

121. 43 C.F.R. §§ 36.11(c), 36.11(h).

was passed in 1980 and that the underlying regulation was promulgated in 1986. These permit snowmachine use for traditional activities in Denali National Park. There is a general six year statute of limitation which governs where, as here, there is no other limitation statute and judicial review is sought under the APA.[122] Therefore, Babbitt contends if the defendant-intervenors had wanted to challenge snowmachine use in the Old Park area, they should have filed suit within six years of October 1986. There are two seemingly interrelated flaws with Babbitt's argument. First, defendant-intervenors are not challenging the governing regulation. Second, despite the regulation, it appears from the record that prior to the Decision, the Park Service never specifically approved any form of snowmachine use in the Old Park. Babbitt's limitation argument is without merit.

### D. Whether Defendant–Intervenors' Claims are Barred by Res Judicata

 Babbitt also contends that the defendant-intervenors' claims are barred by res judicata because they could have been brought in the earlier 1987 suit challenging 43 C.F.R. Chapter 36. Res judicata only applies where (1) the same parties or those in privity with them are litigants in a subsequent proceeding, (2) there was a final judgment on the merits in the earlier proceeding, and (3) there is identity of claims between both suits.[123] If res judicata applies it bars litigation "of any claims that were raised or could have been raised in the prior action."[124] Babbitt's argument fails for several reasons. First, although some of the defendant-intervenors were parties in the preceding action, not all of them were. Second, and perhaps more significantly, there is no identity of

claims. Defendant-intervenors are challenging a decision announced in February 1999. Third, although there was a final judgment in the earlier suit, Babbitt has not met his burden to establish that the final judgment in the 1987 suit was a final judgment on the merits. Any one of these reasons is sufficient to preclude operation of res judicata. Collectively, they establish that Babbitt's res judicata argument is without merit.

### E. Whether the Park Service's Decision violates NEPA

NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."[125] Congress created the Council on Environmental Quality ("CEQ") to implement NEPA. CEQ has promulgated regulations governing NEPA.[126] The regulations provide that in "determining whether to prepare" an EIS an agency must first determine whether the proposed action normally requires an EIS or is subject to a categorical exclusion.[127] If the proposed action does not normally require an EIS or is not subject to a categorical exclusion, the agency must prepare an environmental assessment ("EA").[128] The EA results in either a finding of significant impact, in which case an EIS is required, or a finding of no significant impact ("FONSI"), which obviates any need for an EIS.[129] However, if the proposed action is covered by a categorical exclusion to which no exception applies, then no EA need be prepared. Categorical exclusions are those activities or decisions "which do not individually or cumulatively have a significant effect on the human environment."[130] Each agency identifies categorical exclusions germane to its activities. In identi-

---

**122.** 28 U.S.C. § 2401(a); *see also Wind River Mining Corp. v. United States,* 946 F.2d 710, 713 (9th Cir.1991).

**123.** *See Cabrera v. City of Huntington Park,* 159 F.3d 374, 381 (9th Cir.1998).

**124.** *Id.*

**125.** 42 U.S.C. § 4332(2)(C).

**126.** 40 C.F.R. §§ 1500–1508.

**127.** 40 C.F.R. § 1501.4(a).

**128.** 40 C.F.R. § 1501.4(b).

**129.** 40 C.F.R. §§ 1501.4(b), 1508.9; *see also Greenpeace Action v. Franklin,* 14 F.3d 1324, 1328 n. 4 (9th Cir.1992).

**130.** 40 C.F.R. §§ 1507.3(b)(2)(ii), 1508.4.

fying categorical exclusions, agencies are required to provide for exceptions to such categorical exclusions for any circumstance which "may have significant environmental effect." [131]

Acting pursuant to the governing regulations, the Department of the Interior developed categorical exclusions.[132] The Department also developed a list of exceptions to categorical exclusions.[133] One of the categorical exclusions pertains to modifications, revisions, or new regulations which do not increase use or create noncompatible uses within areas administered by the Park Service:

> (10) Modifications or revisions to existing regulations, or the promulgation of new regulations for NPS-administered areas, provided the modifications, revisions or new regulations do not: (a) Increase public use to the extent of compromising the nature and character of the area or causing physical damage to it; (b) Introduce noncompatible uses which might compromise the nature and character of the area or cause physical damage to it; (c) Conflict with adjacent ownerships or land uses; or (d) Cause a nuisance to adjacent owners or occupants.[134]

The Park Service determined that the preceding categorical exclusion applied to its "proposed" closure.[135] The Park Service found that "[t]he closure would not (a) result in increased public use or cause physical damage to the area, (b) introduce noncompatible uses, (c) conflict with adja-cent ownerships or land uses, or (d) cause a nuisance to adjacent owners or occupants." [136] The Park Service summarily determined that no exception to the categorical exclusion applied: "This action does not qualify as an exception under the departmental NEPA guidelines . . . [t]herefore, additional NEPA assessment and documentation are not needed." [137] Although the Park Service did not explain or elaborate on how it reached these conclusions, once reached the conclusions were used to establish that neither an EA nor an EIS was required to support the Decision.

The Ninth Circuit recently explained that "[a]n agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." [138] Under this standard, an agency's decision is only reversed if the agency committed a "clear error of judgment." [139] The court examines whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." [140] An agency's decision may be reversed under the abuse of discretion standard if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation of the problem that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise." [141] In

---

**131.** 40 C.F.R. § 1508.4.

**132.** Department Manual ("DM"), Part 516, Chapters 2–4 and DM, Part 516, Chapter 6, Appendix 7 (submitted as exhibit A at docket 22).

**133.** 516 DM 2, Appendix 2 (submitted at docket 22, exhibit A at 12).

**134.** 516 DM 6, Appendix 7, ¶ 7.4(10) (submitted at docket 22, exhibit A at 30).

**135.** AR vol. I, tab 20 at 300–01.

**136.** AR vol. I, tab 20 at 300.

**137.** AR vol. I, tab 20 at 287.

**138.** *Alaska Center for the Environment et al. v. U.S. Forest Service et al.,* 189 F.3d 851 (9th Cir.1999).

**139.** *California Trout v. Schaefer,* 58 F.3d 469, 473 (9th Cir.1995).

**140.** *Pyramid Lake Paiute Tribe v. United States Dep't of Navy,* 898 F.2d 1410, 1414 (9th Cir. 1990).

**141.** *Surfrider Foundation v. Dalton,* 989 F.Supp. 1309, 1319 (S.D.Cal.1998) *(citing Dioxin/Organochlorine Ctr. v. Clarke,* 57 F.3d 1517, 1521 (9th Cir.1995)).

the specific context of applying categorical exclusions, "an agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." [142]

### 1. Whether the Categorical Exclusion Finding is Valid

ASSA argues that the Park Service's findings were too conclusory. [143] This court agrees. The Park Service's findings do nothing but restate the categorical exclusion. In *Alaska Center for the Environment v. United States Forest Service*, [144] Judge Singleton concluded that the United States Forest Service failed to rationally explain its reliance on a categorical exclusion when it issued two special use permits for helicopters operating in the Chugach National Forest. [145] The Forest Service's decision simply stated that "[t]his activity falls within a category of actions . . . which do normally do not . . . have a significant effect on the quality of the human environment and, therefore, may be categorically excluded from documentation in an EIS or EA." [146] Judge Singleton held that such a finding was insufficient and observed, "[w]hile the Forest Service may have the discretion to determine that the temporary permitted helicopter activity is not significant, it must still articulate its reasoning." [147] Citing and discussing precedent from the Ninth Circuit, Judge Singleton

noted: "An agency cannot . . . avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment. . . . Instead, an agency must provide a reasoned explanation of its decision." [148]

■■■ Here, as in *Alaska Center for the Environment*, the Park Service "merely restated the categorical exclusion language . . . without any explanation or analysis as to why it considered the activity insignificant or how the several attached permit conditions would prevent application of an exception to a categorical exclusion." [149] No further discussion or analysis was made. This is insufficient. Furthermore, the Park Service's Statement of Finding reveals that the Park Service did not analyze snowmachine use in Denali National Park before determining that a categorical exclusion applied. During the public hearings in November 1998, Superintendent Martin conceded that snowmachine use in the Old Park region had not even been studied. Martin advised a Fairbanks audience that "snowmachining at large or not on trail systems is not something that has been studied and especially in areas where that use has not occurred." [150] Martin told an audience at Mount McKinley Village that the temporary closure's primary purpose was to "hold the status quo or to allow us time to evaluate snowmachining

---

142. *Alaska Center for the Environment,* 189 F.3d at 857.

143. Although there are obvious distinctions, the defendant-intervenors' argument is conceptually similar to ASSA's arguments.

144. A96–293 CV (JKS).

145. *Alaska Center for the Environment,* A96–293 CV, order filed October 30, 1997, docket 36 at 17–20 (submitted as exhibit 9 at docket 31). Pursuant to Local Rule 7.1(c), this court may consider unpublished orders by another judge of this district which bear on the same issue.

146. *Id.* at 18.

147. *Id.* This specific aspect of Judge Singleton's order was not appealed. Another aspect of Judge Singleton's order which upheld a third, separate special use permit was appealed, and the Ninth Circuit affirmed. *See Alaska Center for the Environment v. United States Forest Service,* 189 F.3d 851 (9th Cir.1999).

148. *Alaska Center for the Environment,* A96–293 CV, order, docket 36 at 18 (submitted as exhibit 9 at docket 31) (*quoting Jones v. Gordon,* 792 F.2d 821, 827 (9th Cir.1986)).

149. *Alaska Center for the Environment,* A96–293 CV, order, docket 36 at 18 (submitted as exhibit 9 at docket 31).

150. AR vol. VIII at 236.

throughout the whole park and the whole region, and to get it back in the context of what ANILCA provided for as, you know, what and how should we be snowmachining in this area, what are traditional activities, and what are the resource values that we're here to conserve." [151] Under these circumstances, the Park Service abused its discretion in not explaining its reliance on the categorical exclusion it applied.

### 2. Whether the Finding of "No Exception" is Valid

However, even if one rejected the preceding analysis and concluded that the Park Service properly relied upon the categorical exclusion it invoked in this case, ASSA argues that at least three exceptions to the categorical exclusion applied. These are:

> The following exceptions apply to individual actions within categorical exclusions (CX). Environmental documents must be prepared for actions which may:
> 2.3 Have highly controversial environmental effects.
> 2.4 Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.
> 2.5 Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects. [152]

Although this court has concluded that the defendant-intervenors lack standing, the defendant-intervenors have raised similar objections to the fact that the Park Service made no effort to determine whether any exceptions applied. [153] Because of this court's ruling regarding defendant-interve-

nors' standing, this court will analyze the relevant principles in light of ASSA's arguments. However, to a significant degree, defendant-intervenors are able to piggyback on ASSA's claims because their objections and concerns echo ASSA's arguments even if the parties otherwise seek different outcomes.

■ ASSA contends that the Park Service should not have relied upon a categorical exclusion "because of the controversial, uncertain, and precedent-setting nature of its closure decision." [154] This court agrees that the Park Service should, at a minimum, explain its decision that no exceptions applied. The existence of opposition does not make a proposed action controversial. [155] Instead, a federal action is controversial if "a substantial dispute exists as to [its] size, nature, or effect." [156] There is no substantial dispute in this case about the temporary closure's size or its essential nature. However, there is substantial dispute concerning the temporary closure's effect. In remarks before an Anchorage audience, Superintendent Martin conceded that the proposed action was controversial. Martin noted, "[w]e realize that this is a controversial topic and also that it's pretty complex and it involves a lot of interpretations and a lot of history and those kinds of things." [157] Later during the same public hearing, Martin stated:

> For any type of major change in administration, and this would be true if it were snowmachining or hiking, we're required **if it has a potential to affect Park resources or is significantly controversial, which this issue certainly is,** that you go through a National Envi-

---

**151.** AR vol. VIII at 61.

**152.** *See* 516 DM 2, Appendix 2 (submitted at docket 23 as exhibit A at 12); *see also* ASSA's motion for summary judgment, docket 23 at 24–25.

**153.** Defendant–Intervenors' Motion for Summary Judgment, docket 22 at 44–46.

**154.** ASSA's Motion for Summary Judgment, docket 23 at 36.

**155.** *Foundation for North American Wild Sheep v. United States Dep't Agric.*, 681 F.2d 1172, 1182 (9th Cir.1982).

**156.** *Greenpeace Action v. Franklin*, 982 F.2d 1342, 1353 (9th Cir.1992) (*quoting Wild Sheep*, 681 F.2d at 1182).

**157.** AR. vol. VIII, tab 3 at 125.

ronmental Policy Act Compliance, a lot of people know it as NEPA compliance or the Environmental Impact Statement.[158]

Martin advised a Mount McKinley Village audience:

> We do recognize that [the temporary closure is] somewhat controversial. There is a lot of information out there. Some of it is accurate; some of it is not. We know there's a lot of feelings on the issue and we think it's a real important issue, and that's partly why we're proposing what we're proposing.[159]

The Administrative Record includes references to the controversial, unknown, and uncertain effects of the Park Service's decision. The Park Service's closure order conceded that "the effects that snowmobiling activity may have on the long-term health of the Denali Park ecosystem are uncertain."[160] The Park Service's closure order observed that "[a] major concern of the National Park Service is a significant lack of information about cumulative impacts of snowmobile use."[161] In short, the Park Service abused its discretion in not explaining why exception 2.4 did not apply.

ASSA also contends that exceptions 2.3 and 2.4 apply because the Park Service's closure order has or will have the effect of concentrating use in the two corridors left open, and will have the effect of displacing snowmachine riders into adjacent state parks or other areas. At first impression, ASSA's contention is similar to an argument rejected by the Ninth Circuit in *Bicycle Trails Council of Marin v. Babbit.*[162] In *Bicycle Trails*, the Park Service implemented a previously adopted rule prohibiting off-road bicycle use in the Golden Gate National Recreation Area. The Bicycle Trails Council and other plaintiffs filed suit arguing, in part, that the Park Service's action violated NEPA because no EA or EIS was prepared. The Park Service re-

lied upon the same categorical exclusion it relies upon in this case. In rejecting plaintiffs' arguments that the Park Service abused its discretion by relying upon the categorical exclusion the court noted:

> **Plaintiffs' arguments [that prohibiting off-road bicycle use would increase public use thus compromising the nature and characteristics of the area] ... border on sheer speculation.** Plaintiffs suggest that the closing of trails might force bicyclists to ride in other areas, thereby compromising the nature of those areas. However, the regulation makes clear that riding in any other non-developed area is also forbidden; the suggestion that closing trails will force bicyclists to break the law by riding on similarly closed protected areas is not convincing. To the extent that closing all off-road areas to bicycle use will force bicyclists onto paved roads more, it would not be arbitrary (or unreasonable) for the NPS to have concluded that this increased use of the paved roads and developed areas would not "compromis[e] the nature and character of the area or caus[e] physical damage to it," ... particularly in light of NPS's finding that "bicycle use [is] a very appropriate, low impact method for visitors to enjoy park areas." The new regulation in no way introduces any new use to the park system, much less an incompatible use. Nor does it in any way affect adjacent landowners. Plaintiffs' suggestion that the regulations would somehow force off-road bicyclists to trespass on the property of adjoining landowners is unavailing; the agency should no more assume that citizens will violate any other law than that they will violate the regulation being promulgated.[163]

**158.** AR vol. VIII, tab 3 at 131–32 (emphasis added).

**159.** AR vol. VIII, tab 2 at 57.

**160.** AR vol. I, tab 20 at 271.

**161.** AR vol. I, tab 20 at 284.

**162.** 82 F.3d 1445 (9th Cir.1996).

**163.** *Bicycle Trails,* 82 F.3d at 1457 (citations omitted) (emphasis added).

However, on closer scrutiny, the case at bar must be distinguished from *Bicycle Trails*. There the re-direction of traffic bordered on "sheer speculation." Here, the Decision, unlike the regulation in *Bicycle Trails*, affirmatively does re-direct all snowmachine use of the Old Park into the two corridors. The argument that the temporary closure has or will have the effect of concentrating snowmachine use in other areas of the Park persuasively establishes at least this much: The Park Service should have explained why the exception does not apply. This court concludes that the Park Service abused its discretion in not explaining why exceptions 2.3 and 2.4 did not apply.

ASSA also argues that exception 2.5 applies because the Park Service's closure order establishes a precedent for future action or represents a decision in principle about future actions with potentially significant environmental effects. The administrative record is filled with references supporting ASSA's arguments. The Park Service has always taken the position that the Old Park region is closed to snowmachine use. As previously detailed, the Park Service adopted several different and conflicting positions over the years in attempting to explain why it prohibited snowmachine use. Superintendent Martin candidly admitted that the closure would take effect regardless of what testimony was offered at the public hearings.[164]

Based on the record before the court, the Park Service's closure order establishes a precedent for future action and represents a decision in principle about future actions with potentially significant environmental effects. At a minimum, the Park Service should have explained why this exception to its categorical exclusion did not apply.

### 3. Summary regarding NEPA Claim

The Park Service abused its discretion in relying upon a categorical exclusion because it failed to offer a rational explanation for doing so. The Park Service abused its discretion in finding that no exceptions existed for the same reason. The court is not now holding that the Park Service must prepare an EA, but action of the sort taken cannot be upheld in the absence of an explanation for reliance on the categorical exclusion and an explanation why no exceptions to the categorical exclusion would apply.[165]

### F. Whether the Park Service's Decision violates ANILCA

Both ASSA and Wilderness Society allege that the Decision violates ANILCA. That statute provides, in part:

**Notwithstanding any other provision of this Act or other law, the Secretary shall permit, on conservation system units,** national recreation areas, and national conservation areas, and those

---

**164.** AR vol. VIII, tab 4 at 325–26.

**165.** Although this court is not holding that the Park Service must prepare an EA at this stage, it warrants notice that Superintendent Martin may have led members of the public to believe that the Park Service was going to prepare an EA or EIS. Martin advised a Fairbanks audience that "any time there's a major change or a major change in use, we do go through what the national Environmental Policy Act planning it—you know, a lot of people—Environmental Impact Statement, and that's an administrative procedure and it's a commitment since the late sixties and through the law, that we have made. It's something that we feel any time there's a change in the way something has been managed in a potentially controversial situation, that we put it

through the planning." AR vol. VIII, tab 4 at 236. Martin subsequently made similar comments in Anchorage where he said, "For any type of major change in administration, and this would be true if it were snowmachining or hiking, we're required if it has a potential to affect Park resources or is significantly controversial, which this issue certainly is, that you go through a National Environmental Policy Act Compliance, a lot of people know it as NEPA compliance or the Environmental Impact Statement." AR vol. VIII, tab 3 at 131–32. If the Park Service voluntarily decided to prepare an EA, it would simply accomplish that which Superintendent Martin may have led some members of the public to believe that the Park Service intended to do in the first place.

public lands designated as wilderness study, **the use of snowmachines (during periods of adequate snow cover, or frozen river conditions in the case of wild and scenic rivers),** motorboats, airplanes, and nonmotorized surface transportation methods **for traditional activities (where such activities are permitted by this Act or other law) and for travel to and from villages and homesites. Such use shall be subject to reasonable regulations by the Secretary to protect the natural and other values of the conservation system units,** national recreation areas, and national conservation areas, and **shall not be prohibited unless, after notice and hearing in the vicinity of the affected unit or area, the Secretary finds that such use would be detrimental to the resource values of the unit or area.** Nothing in this section shall be construed as prohibiting the use of other methods of transportation for such travel and activities on conservation system lands where such use is permitted by this Act or other law.[166]

ANILCA thus establishes an "open until closed" policy for snowmachine use for traditional activities. Snowmachine use is only permitted for "traditional" activities, and for travel to and from villages and homesites. As noted, the Secretary promulgated a regulation addressing snowmachine use in Denali Park in 1986 which provides:

The use of snowmachines (during periods of adequate snow cover and frozen river conditions) for traditional activities (where such activities are permitted by ANILCA or other law) and for travel to and from villages and homesites and other valid occupancies is permitted within such areas,

except where such use is prohibited or otherwise restricted by the appropriate Federal agency in accordance with the procedures of paragraph (h) of this section.[167]

43 C.F.R. 36.11(h) provides, in part:

Closure procedures. (1) The appropriate Federal agency may close an area on a temporary or permanent basis to use of aircraft, snowmachines, motorboats or nonmotorized surface transportation only upon a finding by the agency that such use would be detrimental to the resource values of the area.

(2) Temporary closures. (i) Temporary closures shall not be effective prior to notice and hearing in the vicinity of the area(s) directly affected by such closures and other locations as appropriate. (ii) A temporary closure shall not exceed 12 months.[168]

ASSA and defendant-intervenors raise several arguments [169] each of which is examined below, although not necessarily in the order presented by the parties.

### 1. *ANILCA and WA*

▮ Defendant-intervenors contend that ANILCA must be read in conjunction with WA and that, thus construed, no snowmachine use should be permitted. This argument is unpersuasive given ANILCA's clear and unambiguous terms. Section 707 of ANILCA *does* specify that "Except as otherwise expressly provided for in this Act wilderness designated by this Act shall be administered in accordance with ... the Wilderness Act."[170] WA *does* generally prohibit motorized vehicle use in areas designated as wilderness.[171] However, the specific statutory provision at issue in this case provides that

---

**166.** 16 U.S.C. § 3170(a) (emphasis added).

**167.** 43 C.F.R. § 36.11(c) (emphasis added).

**168.** 43 C.F.R. § 36.11(h).

**169.** The court will consider defendant-intervenors arguments below, because the court's decision that they lack Article III standing is

subject to appeal, and because some of their arguments bear analysis in relation to ASSA's arguments.

**170.** Alaska National Interest Lands Conservation Act, Pub.L. No. 96–487, § 707, 94 Stat. 2371, 2421 (1981).

**171.** 16 U.S.C. § 1133(c).

"[n]otwithstanding any other provision of this Act or other law, the Secretary shall permit ... the use of snowmachines ... for traditional activities."[172] This clear language cannot be reconciled with Wilderness Society's position. ANILCA unambiguously establishes that snowmachine use for traditional activities shall be permitted unless such use would be detrimental to the resource values of the area.

## 2. Traditional Activities: A Definition is Needed

 Wilderness Society correctly observes that snowmachine use in CSUs is only permitted for traditional activities. ANILCA does not define traditional activities. The regulations adopted pursuant to ANILCA do not define traditional activities. Wilderness Society argues that traditional activities should be interpreted to mean subsistence activities. It seems doubtful that traditional use of snowmachines pertains only to subsistence-related activities, because ANILCA separately sanctions snowmachine use for subsistence purposes on all public lands at 16 U.S.C. § 3121.[173] Were the ANILCA provision at issue here, 16 U.S.C. § 3170(a), intended to allow snowmachine use only for subsistence activities, it would be entirely superfluous with respect to snowmachine use.[174] Moreover, the fact that Congress obviously knew how to identify subsistence activities in other parts of ANILCA when that was the topic being addressed renders it unlikely that Congress intended "traditional activities" to mean "subsistence" activities. Finally, the Secretary appears to have recognized a distinction between subsistence activities and other traditional activities.[175]

Of course, the fact that "traditional activities" includes activities beyond subsistence activities, does not mean that the definition of traditional activities has no boundary. At one time, the Park Service defined "traditional activity" as an activity "that was regularly practiced in the former Mt. McKinley National Park prior to the 1980 passage of ANILCA."[176] Under this definition, any use of snowmachines in the Old Park was excluded from the definition of traditional activities.[177] However, it does not appear that this definition was adopted as part of any formal process; rather, it appears to have been announced as a park rule in the Superintendent's compendium of rules. Certainly, the decision to close most of the Old Park to use of snowmachines for traditional activities which the Park Service said was necessary to maintain a status quo which already prohibited all use of snowmachines merely places a vintage definition in a new bottle, but simultaneously opening a part of the Old Park to snowmachine use is utterly inconsistent with the notion that snowmachine use cannot be a traditional activity because it did not take place in the Old Park prior to 1980. Indeed, the Statement of Finding can be read to abandon the Park Superintendent's rule defining traditional activities:

> There was no history of authorized general public snowmobile use in the old park for any activity traditional or otherwise. The enactment of section 1110(a) of ANILCA left this general prohibition of snowmobile use in the old park area intact unless the snowmobile use was for the purpose of conducting a "traditional activity." Snowmobiling unconnected with some "traditional activity" did not fall within the terms of

---

**172.** 16 U.S.C. § 3170(a).

**173.** 16 U.S.C. § 3121.

**174.** Both § 3121 and § 3170(a) also address motorboats. The former also addresses "other forms of surface transportation," the latter "other forms of nonmotorized surface transportation." Only § 3170(a) address the use of airplanes. Thus, it is only as to snowmachines and motorboats that the two statutes would completely overlap under Wilderness Society's interpretation.

**175.** 43 C.F.R. § 36.11(b).

**176.** Compendium of Rules, May 21, 1992, § 2.18 (submitted as AR vol. X, tab 6 at 20).

**177.** *Id.*

section 1110(a) and thus, remained prohibited in the old park.[178]

In sum, a review of the Administrative Record cannot but lead to the uncomfortable conclusion that the Park Service has no formally established position (and perhaps not even an informally established position that is both current and coherent) of what constitutes "traditional activities" within the meaning of ANILCA.

Babbitt's answer to ASSA's complaint in this case might have but fails to shed any light on what the Park Service presently considers to be a traditional activity. ASSA alleges that it "is an organization consisting of outdoor recreationists" and that its members "use snowmachines as . . . a primary means of access to or for traditional activities in the Old Park and elsewhere."[179] ASSA further alleges with considerable specificity that its members use snowmachines for "sightseeing, solitude, photography, back country camping, wilderness experience, and other traditional activities."[180] Read together these allegations indicate that ASSA believes that sightseeing, solitude, photography, back country camping and wilderness experience are traditional activities. Babbit's answer neither admits nor denies ASSA's allegations. Instead Babbitt's answer says: "Federal defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of [paragraphs 9 and 10] of the Complaint."[181] Technically, this has the effect of a denial under the rules of civil procedure,[182] but when contrasted with a simple denial of the allegations, the response leads the reader to conclude that Babbit wishes to avoid taking any position on whether any of the enumerated activities are traditional ones.

The Secretary's failure to define traditional activities has significant consequences for judicial review of any decision affecting the use of snowmachines in the park. Until the term is defined, it is virtually impossible for a court to review whether any action closing portions of the park to snowmachine use is consistent with ANILCA. Consider even this hypothetical: Suppose that an administrative record demonstrated that the Park Service quite properly concluded that existing levels of snowmachine use in the park are a detriment to resource values in the park, and used that conclusion as the basis to close the park to snowmachine use for traditional activities. Suppose further that such a decision were presented to a court for review on a record which did not disclose how much of the existing use of the park by snowmobilers was for traditional activities. Clearly, in the absence of information showing how much of the existing use was for traditional activities, it would be impossible to determine whether there was a rational basis for deciding that the traditional activity component of snowmachine use was detrimental to park resources.[183] Of course, it will always be impossible to obtain the requisite information so long as traditional activities remains an undefined term.

3. *Whether ANILCA requires that Alternatives to Closure be Studied*

ASSA contends that the phrase "subject to reasonable regulation" requires the Park Service to first explore reasonable alternatives before ordering a blanket closure. Neither the statute nor the governing regulation imposes such a requirement. Furthermore, the Park Service has

178. AR. vol. I, tab 20 at 1–2.

179. Complaint, filed February 22, 1999, ¶ 9 at 5–6.

180. Docket 1, Complaint, filed February 22, 1999, ¶ 10 at 6.

181. Docket 16, Defendants' Answer, filed May 21, 1999, ¶¶ 9 and 10 at 4.

182. Fed.R.Civ.P. 8(b).

183. Actually one can conceive an unlikely exception: If **any** use of the park had been shown to damage park resources, it would follow that a closure to use for traditional activities would be appropriate.

arguably explored reasonable alternatives. It employed a temporary, as opposed to a permanent, closure. It restricted the closure to the Old Park leaving much of Denali National Park to snowmachine use for traditional activities. Even in the Old Park, the Park Service left open two corridors for snowmachine use. ASSA lists several other potential options the Park Service could have considered before prohibiting all snowmachine use. ASSA's recommendations may or may not have merit, but ASSA misses the point. The issue is committed to agency discretion. There is no specific requirement that the Park Service explore reasonable alternatives before ordering a temporary closure. The only requirement is that any such closure be reasonable, a requirement more flexible than a specific mandate to consider every alternative that may be conceived to be reasonable.

### 4. *Whether Snowmachine Use is Detrimental to the Area*

Finally, ASSA contends that the Park Service abused its discretion in finding that snowmachine use would be "detrimental to the resource values of the area." [184] As explained in section 2 above, the failure to define traditional activities dooms the closure from the outset, but ASSA has a different argument which is that the Decision violates ANILCA because the Park Service did not conduct an adequate study of snowmachine use in the Old Park and because the Park Service relied upon allegedly speculative studies in analyzing whether snowmachine use would be detrimental to the resource values of the Old Park. The Park Service examined the resource values of Denali National Park. [185] The Park Service analyzed the effects of snowmachine use on the park's resource values. [186] Based on studies from other states, the Park Service concluded that snowmachine use would have an adverse impact on wildlife in the Old Park. [187] The Park Service also determined that snowmachine use adversely affects vegetation and soils. [188] The Park Service also found that snowmachine use conflicted with other recreational uses such as skiing, ski-joring, and dog mushing. [189] The Park Service identified additional concerns regarding snowmachine use, including that recreational snowmachine use had interfered with subsistence uses in adjacent lands, [190] and the impact snowmachine use had on air and water quality. [191]

Notwithstanding the steps taken by the Park Service, ASSA challenges the adequacy of the Park Service's methodology and findings. At first impression, ASSA's criticism seems impuissant. Upon closer scrutiny of the administrative record in light of ANILCA's "open until closed" mandate, ASSA's arguments appear somewhat more persuasive. By its own admission, the Park Service has not studied the quantitative or qualitative use of snowmachines in Denali National Park. During the public hearings in November 1998, Superintendent Martin conceded that snowmachine use in the Old Park region had not even been examined. Martin advised a Fairbanks audience that "snowmachining at large or not on trail systems is not something that has been studied and especially in areas where that use has not occurred." [192] Martin told an audience at Mount McKinley Village that the temporary closure's primary purpose was to "hold the status quo or to allow us time to evaluate snowmachining throughout the whole park and the whole region, and to get it back in the context of what ANILCA

184. 43 C.F.R. § 36.11(h)(1).

185. AR vol. I, tab 20 at 272–76.

186. AR vol. I, tab 20 at 276–86.

187. AR vol. I, tab 20 at 277–81.

188. AR vol. I, tab 20 at 281–82.

189. AR vol. I, tab 20 at 283–84.

190. AR vol. I, tab 20 at 284.

191. AR vol. I, tab 20 at 285–86.

192. AR vol. VIII at 236.

provided for as, you know, what and how should we be snowmachining in this area, what are traditional activities, and what are the resource values that we're here to conserve."[193] The Park Service's closure order concedes that "the effects that snowmobiling activity may have on the long-term health of the Denali Park ecosystem are uncertain."[194] The Park Service's closure order also observes that "[a] major concern of the National Park Service is a significant lack of information about cumulative impacts of snowmobile use."[195] Indeed, the Park Service's closure order specified that one of the reasons for the temporary closure was to provide additional time to develop more information concerning the effects of snowmachine use.[196] The Park Service candidly admitted that "[t]he growth in snowmobile use is an increasing concern for land managers and the public in Alaska as well, but the growth is so recent that there has not been enough time to conduct local studies."[197]

 In the abstract, the Park Service's declared intent to use the closure to develop additional information seems reasonable, but considered in light of ANILCA's "open until closed" mandate, closing the Old Park without a convincing explanation of how experience elsewhere warrants the closure would be problematic. The Park Service has not said with reasonable assurance how many snowmachines are used in the park, what types are used, for what purposes they are used, where they are used, or how often they are used. Without quantifying these variables it is difficult to say that snowmachine use would be detrimental to any resource value.[198] ANILCA

does not permit closure absent a finding that the prohibited use "would be detrimental to the resource values of the unit or area."[199]

Although this court has found no cases directly on point, and the parties have not cited any, there is case law which is critical of agency actions taken without adequate information regarding the consequences of the action. For example, in *Foundation for North American Wild Sheep v. United States Dep't of Agriculture,*[200] the Ninth Circuit held that an agency's decision not to prepare an EIS for a proposed road project that passed through an area inhabited by Bighorn Sheep was unreasonable where the agency had completely failed to conduct any analysis of actual traffic volume or frequency in the affected area. The court noted:

> Perhaps the most glaring shortcoming of the EA is its failure to include any estimate of the expected amount of truck traffic on Road 2N06 from the Curtis mine. We fail to see how the effect of reopening Road 2N06 can be evaluated intelligently without some consideration of the amount of traffic likely to flow along the road. Moreover, the EA lists as one of its assumptions that unauthorized vehicular traffic will occur on Road 2N06 should it be reopened. No effort was made to quantify the amount of unauthorized traffic nor was the effect on the Bighorn of this traffic evaluated. The omission of any meaningful consideration of such fundamental factors precludes the type of informed decision-making mandated by NEPA.[201]

---

**193.** AR vol. VIII at 61.

**194.** AR vol. I, tab 20 at 271.

**195.** AR vol. I, tab 20 at 284.

**196.** AR vol. I, tab 20 at 269, 288–89.

**197.** AR vol. I, tab 20 at 276.

**198.** ASSA points out that at least one study conducted in Alaska concluded that snowmachines had no more affect on vegetation and

soil than other recreational uses such as skiing. *See* ASSA's Motion, docket 23 at 20; *see also* Kathryn S. Tietz, Standardized Trampling in Interior Alaska Taiga Ecosystem: Impact Evaluation (1996) (unpublished Master of Science thesis, University of Alaska–Fairbanks) (submitted as exhibit 3 at docket 23).

**199.** 16 U.S.C. § 3170(a); 43 C.F.R. § 36.11(h)(1).

**200.** 681 F.2d 1172 (9th Cir.1982).

**201.** *Id.* at 1178.

In *Thomas v. Peterson*,[202] the Ninth Circuit held that the Forest Service's failure to study or prepare any biological assessment for a proposed road project violated the Endangered Species Act.[203] In *National Audubon Society v. Hoffman*,[204] environmental groups filed suit challenging a decision by the Forest Service to extend a road and conduct a logging operation in a national forest area. The Forest Service prepared an EA before reaching its decision in which it conceded that unauthorized use of roads and trails was occurring by people using all-terrain vehicles ("ATVs"), and that such unauthorized use would likely increase if the road in question was extended.[205] However, no attempt had been made to study or quantify this unauthorized use. The District Court for the District of Vermont held that the Forest Service's EA was inadequate and thus violated NEPA. The court noted, "[i]t is questionable whether an informed decision not to prepare an EIS can be made absent an effort to quantify the amount of unauthorized traffic which will occur upon the lengthening and improvement [of the road]."[206] In *Dolan v. City of Tigard*,[207] a business owner sought a building permit to increase the size of her store. A city planning commission conditioned award of the permit upon construction of a pedestrian and bicycle pathway to alleviate the projected increase in traffic volume that the store addition would have on the area. However, no actual studies or estimates were prepared to support the assumption that the bicycle and pedestrian pathway would help reduce traffic. Upon review of a Fifth Amendment takings argument, the United States Supreme Court held that the city's findings were inadequate. The Court acknowledged that "the city was correct in finding that the larger retail sales facility proposed by petitioner will increase traffic on the streets of the Central Business District."[208] However, no attempt had been made to establish that the proposed bicycle and pedestrian path would somehow alleviate the increased traffic volume. Writing for the majority, Chief Justice Rehnquist observed:

As Justice Peterson of the Supreme Court of Oregon explained in his dissenting opinion, however, "[t]he findings of fact that the bicycle pathway system '*could* offset some of the traffic demand' is a far cry from a finding that the bicycle pathway system *will*, or is *likely to*, offset some of the traffic demand." [citation omitted]. No precise mathematical calculation is required, but the city must make some effort to quantify its findings in support of the dedication for the pedestrian/bicycle pathway beyond the conclusory statement that it could offset some of the traffic demand generated.[209]

Although all of these cases arose in different contexts, involved different statutory or regulatory schemes, and were governed by different standards of review, the core rationale of these authorities suggests that if an agency is to make a non-arbitrary decision affecting a particular use of a particular place, it must examine that use in the particular place, or where that is impossible, then it must at least provide some other rational explanation for the action. Not having studied snowmachine use in Denali Park, the Park Service must provide a rationale that supports the conclusion that snowmachine use for tradition-

**202.** 753 F.2d 754 (9th Cir.1985).

**203.** *Id.* at 763.

**204.** 917 F.Supp. 280 (D.Vt.1995), *aff'd in part and rev'd in part,* 132 F.3d 7 (2d. Cir.1997).

**205.** *National Audubon,* 917 F.Supp. at 284.

**206.** *Id.* at 288. On appeal, the Second Circuit affirmed the district court's holding that the Forest Service's EA was inadequate and thus constituted a NEPA violation. *See National Audubon Society et al. v. Hoffman,* 132 F.3d 7, 19 (2d Cir.1997).

**207.** 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).

**208.** 512 U.S. at 395, 114 S.Ct. at 2321.

**209.** 512 U.S. at 395–96, 114 S.Ct. at 2322 (emphasis in original).

al activities will actually cause resource damage before closing lands to such use in order to comply with ANILCA. ASSA makes at least a colorable case that the Park Service has not done so, but the failure to define traditional activities in the first place makes it unnecessary, indeed impossible, for the court to pass judgment on this issue.

### V. RELIEF

In its motion, ASSA asks the court to "set aside the Closure Order and order the Park Service to comply with its statutory duties."[210] In its complaint ASSA asks the court to declare that the Decision violates ANILCA, NEPA, Park Service regulations and the APA, to vacate the decision, and to enjoin defendants from closing the Old Park to the use of snowmachines for purposes sanctioned by ANILCA pending compliance with ANILCA and other applicable provisions of law.[211]

The analysis set out in this order shows that the Decision is arbitrary and capricious because the absence of any definition of traditional activities necessarily means that the Decision contains no rational basis for the conclusion that the use of snowmachines for traditional activities in the Old Park is detrimental to the resource values of the Old Park. It follows that the court must and does declare that the Decision violates ANILCA and the APA. On the available record, the court cannot determine whether the Park Service has violated NEPA. The court finds it unnecessary to delve into the issue of whether the Park Service has violated its own regulations. The requested injunction asks the court to order defendants to comply with the law. That is an obligation that exists independent of any order this court might issue. The court is not persuaded that following remand, there is any reason to believe defendants will attempt to enforce the De-

cision or any other restriction contrary to ANILCA. Indeed, the Park Service track record has been to condone snowmachine use of park land for many years despite its only recently rejected view that no use of a snowmachine in the Old Park could be considered use for a traditional activity.[212] An injunction will not be issued.

### VI. CONCLUSION

For the foregoing reasons, it seems to the court that Babbitt's motion for summary judgment at docket 31 should probably be **DENIED,** ASSA's motion for summary judgment at docket 23 should probably be **GRANTED IN PART** and **DENIED IN PART** such that the Decision is declared to violate ANILCA and the matter remanded to the Park Service, and Wilderness Society's motion for summary judgment at docket 22 should probably be **DENIED.**

This preliminary order does not represent the court's final order. The court may or may not adopt this preliminary order as its final order. This preliminary order does not authorize the filing of any additional briefing.

---

**210.** Docket 23, at 49.

**211.** Docket 1, at 39.

**212.** The court is not holding that such a view of snowmachine use in the Old Park is neces-

sarily inconsistent with ANILCA. But, until the Park Service properly defines what is a traditional activity, it cannot give this or any other view the force of law.