**ATLANTIC STATES LEGAL FOUNDATION,**
Plaintiff,

v.

**Bruce BABBITT, as Secretary, United States Department Of the Interior; The United States Department of the Interior; and John Cahill, Commissioner of the New York State Department of Environmental Conservation,**
Defendants.

No. 99–CV–1292 (HGM/GLS).

United States District Court,
N.D. New York.

April 6, 2001.

Atlantic States Legal Foundation, Albany, NY, Carl D. Dworkin, for Plaintiff.

Office of the Attorney General, Office of Attorney General, State of New York, Lawrence Rappoport, Assistant Attorney General, Hon. Daniel J. French, United States Attorney, Northern District of New York, Albany, NY, James C. Woods, Assistant U.S. Attorney, for Defendants.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

### INTRODUCTION

Currently before the court are two Rule 56 motions for summary judgment filed by the defendant John C. Cahill and defendant Bruce Babbitt respectively. Plaintiff

opposes these motions and has filed its own cross-motion for summary judgment. For the following reasons, defendant Babbitt's and defendant Cahill's motions for summary judgment are granted and the complaint is dismissed against all remaining defendants.[1] Plaintiff's cross-motion is denied as moot.

## BACKGROUND

Plaintiff, a New York not-for-profit corporation dedicated to environmental protection, brings this action to challenge defendant Babbitt's and the United States Department of Interior's decision ("USDI"), through the United States Fish and Wildlife Service ("USFWS"), to issue a migratory bird depredation permit to the New York State Department of Environmental Conservation ("NYSDEC"). The permit allows the NYSDEC to limit the reproduction of double-crested cormorants in the eastern basin of Lake Ontario by the taking, or killing, of unborn birds. Issued on May 3, 1999, and in effect until February 28, 2000, it authorized the NYSDEC: (1) to spread vegetable oil on unhatched eggs in up to 7,500 nests on Little Galloo Island; (2) to destroy up to 500 nests with eggs on Gull, Bass and Calf Islands; and, (3) shoot up to forty cormorants at ten fish stocking sites. Although the double-crested cormorant, or *Phalacrocorax auritus,* is protected by the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703, *et seq.,* the USFWS issued this permit after determining that these proposed measures would not significantly impact the environment.

According to the NYSDEC, authorities oiled cormorant eggs as permitted on Little Galloo Island from May 6, 1999, to July, 8 1999. Plaintiff filed its original complaint roughly one month later, alleging that the federal defendants—Bruce Babbitt and USDI—violated the MBTA, National Environmental Policy Act ("NEPA"), 42 U.S.C. § 703, *et seq.,* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, *et seq.,* by issuing the depredation permit. It also alleged that the NYSDEC violated the New York Environmental Conservation Law ("ECL") by seeking the permit. With its complaint, plaintiff sought declaratory judgment finding that the depredation permit violated the MBTA, NEPA and 5 U.S.C. § 706(2)(A). It also asked for injunctive relief in the form of an Order enjoining the federal defendants from issuing a depredation permit for the taking of cormorants on Little Galloo Island until they complied with the above treaties.

Shortly thereafter, this court addressed a motion by the NYSDEC to dismiss along with plaintiff's cross-motion to amend the original complaint. At issue in these motions was whether or not the NYSDEC was a proper party to this lawsuit. As the original complaint was a complaint against the state, the NYSDEC claimed sovereign immunity pursuant to the Eleventh Amendment and asked for dismissal. Agreeing with the NYSDEC, the court granted its motion to dismiss but allowed plaintiff to amend the original complaint. Thereafter, plaintiff filed an amended com-

---

**1.** On March 12, 2001, plaintiff and defendant Cahill executed a stipulation that narrows the scope of Atlantic State's allegations. Consequently, the only remaining issue against defendant Cahill is whether he violated the National Environmental Policy Act ("NEPA") by destroying cormorant eggs. Moreover, plaintiff agrees that this issue will be moot if the court upholds the issuance of a permit to destroy cormorants by defendant Babbitt. Although this issue is not discussed herein, the claims against defendant Cahill are dismissed as plaintiff lacks standing to challenge Babbitt's actions. For this reason, plaintiff likewise lacks standing to challenge defendant Cahill's actions.

plaint that restates the above allegations and includes defendant Cahill.

On September 1, 2000, the federal defendants filed their motion for summary judgment. With this motion, defendants claim that plaintiff: (1) lacks standing to pursue this action; and (2) has failed show the requisite irreparable harm or likelihood of success on the merits to be eligible for injunctive relief.[2] In response, plaintiff asserts several bases for standing and seeks summary judgment claiming that USFWS' decision to issue a depredation permit was an arbitrary, capricious abuse of discretion that violated both NEPA and the MBTA. It also offers proof that it has satisfied the requirements necessary for injunctive relief. As the issue of plaintiff's standing is dispositive, the court will not address defendant's irreparable harm defense.

## DISCUSSION

### I. Standing in NEPA Cases

■ Article III of the Constitution limits the authority of federal courts to decide only actual cases and controversies. See *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). In order to establish "the irreducible constitutional minimum of standing," a plaintiff must demonstrate that: (1) he has suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical;' " (2) there is a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."; and (3) it must be

"likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal citations and quotation marks omitted).

■ The determination of whether Article III standing exists also must comport with the "manner and degree of evidence required at the successive stages of the litigation." *Id.*, 504 U.S. at 561, 112 S.Ct. at 2136. At the summary judgment stage, a plaintiff cannot rest upon mere allegations of injury to show standing, but must produce affidavits or other evidence to support its claims. *See Id.* at 561, 112 S.Ct. at 2137. Furthermore, the party invoking federal jurisdiction bears the burden of establishing these elements. *See Id.*

Although the standing doctrine is rooted in Article III, it also implicates prudential limitations on a court's authority to hear a case. *See Lee v. Board of Governors of the Federal Reserve System*, 118 F.3d 905, 910 (2d Cir.1997). Even if the constitutional standing requirements are satisfied, "a court may nevertheless deny standing for prudential reasons." *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir.1994) (*quoting Lamont v. Woods*, 948 F.2d 825, 829 (2d Cir.1991)). The Supreme Court has developed the prudential requirements of standing and applied them in a discretionary fashion as rules of judicial "self-restraint", *Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101, 1106 (2d Cir.1992) (*quoting* Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953)), to further preserve the "the proper—and properly limited—role of the courts in a democratic society." *Wight v. Bankameri-*

---

**2.** On the same day, defendant Cahill filed his motion for summary judgment which the court does not discuss herein as the bases for dismissal are irrelevant to the question of standing. However, defendant Cahill does implicitly join in the federal defendants' standing defense.

ca Corporation, 219 F.3d 79, 86 (2d Cir. 2000) (quoting Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)).

■ Due to prudential considerations, a plaintiff generally may not rely upon the legal rights of a third-party. See Id. These considerations also suggest that courts should not adjudicate "abstract questions of wide public significance" which amount to "generalized grievances." Sullivan, 962 F.2d at 1106. (citations and internal quotation marks omitted). Furthermore, it is clear that the interest asserted by a plaintiff should be "within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Id. (quoting Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

■ In NEPA cases, a plaintiff must establish standing under the APA as NEPA itself does not create a private right of action for its violation. See Knowles v. United States Coast Guard, 924 F.Supp. 593, 599 (S.D.N.Y.1996) (plaintiff must establish standing under the APA because NEPA does not establish a private cause of action); see also Pres. Coalition of Erie County v. Fed. Transit Admin., 129 F.Supp.2d 551, 561 (W.D.N.Y. 2000) (reviewing the adequacy of a final environmental impact statement under the APA after acknowledging that NEPA does not provide a private right of action for its violations). The APA allows a plaintiff to seek injunctive relief when he is "adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702; see also Knowles, 924 F.Supp. at 599. Therefore, a plaintiff seeking relief under the

APA for a NEPA violation must establish that the injury suffered falls within the "zone of interests" against which NEPA was designed to protect. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) ("we have said that to be 'adversely affected or aggrieved ... within the meaning' of a statute, the plaintiff must establish that the injury he complains of ... falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint").

■ NEPA was designed and enacted "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. § 4321. For this reason, courts have construed the Act's "zone of interests" to include injury to the "recreational use and aesthetic enjoyment" of the environment. See Nat'l Wildlife Fed'n, 497 U.S. at 886, 110 S.Ct. at 3187 ("[w]e have no doubt that 'recreational use and aesthetic enjoyment' are among the sorts of interests those statutes were specifically designed to protect").[3]

In this case, plaintiff attacks legality of the federal defendants' management of the Little Galloo Island cormorant population. Since Atlantic States is a private environmental protection organization and defendants' activities have not injured it directly, plaintiff actually asserts an injury

---

**3.** Aesthetic injury is also sufficient to confer standing in MBTA cases. See Alaska Fish and Wildlife Federation and Outdoor Council, Inc., v. Dunkle, 829 F.2d 933, 937 (9th Cir.1987) (finding that aesthetic enjoyment of members of plaintiff organization conferred standing to challenge agreements that were invalid under the MBTA).

arising from a government action that affects a third party. In such situations, standing is not precluded but it is considered to be "substantially more difficult" to establish. *See Defenders of Wildlife*, 504 U.S. at 562, 112 S.Ct. at 2137 (citations and internal quotation marks omitted). Therefore, in order for Atlantic States to establish its standing, it must submit evidence that one or more of its members are " 'directly' affected [by a government action] apart from their 'special interest' in the subject." *Id.* at 563, 112 S.Ct. at 2137–2138.

Recognizing this requirement, the federal defendants seek summary judgment claiming that plaintiff failed to provide affidavits from suitably aggrieved members of its organization. To cure this oversight, plaintiff subsequently produced affidavits from four individuals who allege that defendants' actions have interfered with their "aesthetic enjoyment" of the Little Galloo cormorant colony. They also claim to have suffered an "informational injury," from the USFWS's failure to prepare an environmental impact statement ("EIS") concerning its actions on Little Galloo Island. The court will address these issues *seriatim*.

### 1. *Aesthetic Enjoyment*

As previously indicated, the recreational use and aesthetic enjoyment of the environment falls within the zone of interest that statutes like NEPA were designed to protect. *See Nat'l Wildlife Fed'n*, 497 U.S. at 886, 110 S.Ct. at 3187. For this reason, an individual whose use and enjoyment of nature is threatened by government action may challenge this interference through NEPA and the APA. In this case, plaintiff can establish its standing to pursue its claims with proof that its members' use and enjoyment of the eastern Lake Ontario basin was injured by the taking of cormorants. To this end, plaintiff provided the affidavit of Andrew Mason who claims that the destruction of cormorant eggs has made it impossible to observe the nesting activities of Little Galloo cormorants. Specifically, Mason, a bird watcher and Atlantic States member, states that he previously visited the eastern basin of Lake Ontario to observe wildlife. According to Mason, the Little Galloo Island cormorants are a principal attraction to which many "birding" groups annually travel.[4] However, he claims that these expeditions have been canceled due to the destruction of Little Galloo cormorant eggs.[5] Plaintiff believes this interference with Mason's enjoyment of the eastern basin gives it standing to pursue the instant claims.

Despite plaintiff's ardent belief to the contrary, the Mason affidavit does not assist plaintiff's cause as Mason lacks standing to challenge defendants' actions. Although his affidavit clearly states that the destruction of cormorants prevents him from observing the cormorant in its natural environment and making future trips to Little Galloo Island, Mason never claims to have actually visited the Little Galloo cormorants after the destruction began. While this slight detail may seem insignificant, it is clear that Mason has not been directly affected by defendants' actions. Clearly, Mason anticipates some future harm by virtue of the destruction of cormorants, however, prospective injuries alone are not considered injuries in fact and cannot confer standing. *See Defenders of Wildlife*, 504 U.S. at 564, 112 S.Ct.

---

4. Mason is a member of the Audubon Society and leader of bird watching expeditions to the eastern Lake Ontario basin.

5. Specifically, Mason states that the Audubon Society has canceled future visits to Little Galloo Island because of the defendants' activities.

at 2138 (finding that "some day" intentions to visit areas affected by government action, without more, do not support a finding of actual or imminent injury). Since Mason did not actually visit the Little Galloo Island cormorants either before or after the takings began, he has not suffered a perceptible harm. For this reason, the Mason affidavit does not confer standing upon plaintiff to pursue the instant suit.[6]

Perhaps anticipating the inefficacy of Mason's affidavit, plaintiff also provides testimony from two other Atlantic States members, Peter Doherty and Hilary Llewellyn–Southern, who also claim that the destruction of cormorants has affected their aesthetic enjoyment of these birds in nature. Unlike Mason, these affiants actually visited Little Galloo Island five or six times in the Summer and Fall of 2000, in order to observe and satisfy their interest in caspian terns, black-crowned night herons and cormorants. Despite Little Galloo Island's distance from humankind, they indicate that the behavior of the resident cormorants was dramatically different from that which they observed in other undisturbed locations. They also testified that their enjoyment and observation of the largest cormorant colony in the eastern basin of Lake Ontario, Little Galloo Island, was permanently harmed by the defendants' depredation activities.

■■■■ Although it is clear from Doherty's and Llewellyn–Southern's testimony that these individuals actually visited and

---

**6.** Plaintiff also argues that Mason's aesthetic injuries are more than the general averments and "some day intentions" to visit a species found inadequate in *Defenders of Wildlife*, 504 U.S. at 564, 112 S.Ct. at 2138. Referencing *Friends of the Earth, Inc., v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), it maintains that Mason's declaration is sufficient to establish standing as it successfully recounts a concrete, actual "injury in fact" by declaring that uses and enjoys the eastern basin of Lake Ontario region and would be harmed by the loss of cormorants in that area.

In *Laidlaw*, plaintiff provided testimony from organizational members who lived on or near a river affected by defendant's waste disposal activities. These affiants claimed to have previously used certain regions in the river for recreational activities and would again but for fear of the pollutants discharged by the defendant. The Supreme Court affirmed the District Court's conclusion that these statements adequately alleged an injury in fact and established plaintiff's standing to pursue its suit. With its decision, the Court recognized that "environmental plaintiffs [can] adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened.'" *Laidlaw*, 528 U.S. at 183, 120 S.Ct. at 705 (*quoting Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). It also distinguished the earlier precedent found in *National Wildlife Federation*, and *Defenders of Wildlife*, by determining that the "affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests." *Id.* at 183–184, 120 S.Ct. at 705.

In the instant case, plaintiff attempts to connect certain similarities between the affidavits provided in *Laidlaw* and Mason's testimony. It argues that Mason's prior and future recreational use of the eastern Lake Ontario basin has been affected by the destruction of cormorants in the same manner deemed sufficient in *Laidlaw*. Therefore, plaintiff maintains that Mason's failure to actually visit Little Galloo Island does not vitiate his standing to challenge defendants' actions. The court disagrees. Unlike in *Laidlaw*, the eastern basin of Lake Ontario is an extensive area in which Little Galloo Island is merely a remote, isolated part. Mason does not claim to have used the specific Little Galloo Island region in his past as the affiants in *Laidlaw* had done. Therefore, Mason's professed, but somewhat amorphous intent to visit Little Galloo fails to show the type of harm contemplated in *Laidlaw*. For this reason, the instant situation is sufficiently distinct from that found acceptable in *Laidlaw* to defeat plaintiff's attempt to gain standing through Mason's affidavit.

observed the Little Galloo cormorants, they still do not provide plaintiff with standing. Admittedly, the affidavits show that the use and aesthetic enjoyment of the environment by members of the Atlantic States Organization has been directly injured by the destruction of Little Galloo Island cormorants. Moreover, such proof of direct harm to an organization member is normally enough to confer standing upon the organization itself. However, the relevant date for determining whether a plaintiff has standing is that on which the suit is commenced. *See Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir.1993) (addressing the difference between standing and mootness, the Second Circuit recognized that the standing doctrine evaluates a litigant's personal stake as of the outset of the litigation). In this case, the litigation was commenced on August 16, 1999, and so plaintiff must establish its standing as of that date. Since Doherty and Llewellyn–Southern did not visit Little Galloo Island until the Summer of 2000, plaintiff has not shown that any of its members suffered a direct injury and had a personal stake in this litigation's outcome at its outset.[7] Absent such proof, plaintiff has not met its burden of establishing standing with proof that defendants' actions injured its members' use and aesthetic enjoyment of the environment.

### 2. *Informational Injury*

Plaintiff also produced affidavits from Atlantic States members who suffered an "informational injury," stemming from the USFWS's failure to prepare an EIS. Specifically, Atlantic States submits affidavits from Andrew Mason, Vivian Newman and Ronda Roaring suggesting that the USFWS should have prepared an EIS to evaluate the biological impact of the NYS-

DEC's cormorant management activities. The affiants are members of various wildlife conservation groups, including Atlantic States, which circulate information about wildlife to the interested public and organization members. They participate in this dissemination function by gathering information from a variety of public sources, including EISs, and distributing it through newsletters. In this case, each affiant claims that the lack of an EIS has prevented them from distributing information about cormorant management on Little Galloo Island. They are also unable to assess the impact of defendants' activities and publish a reasoned position about these actions to members of their respective groups. Moreover, they insist that the failure to produce an EIS prevented their effective participation in the public commentary process guaranteed by the NEPA and the APA. Finally, the affiants suggest that without an EIS it is impossible for them to determine if the defendants have complied with NEPA.

With the affiants' testimony concerning their respective informational injuries, plaintiff seeks to establish what is known as "informational standing." This type of standing arises only in very specific circumstances where a statutory provision explicitly creates a right to information. *See American Farm Bureau v. United States Environmental Protection Agency*, 121 F.Supp.2d 84, 97 (D.D.C.2000) (*quoting Animal Legal Defense Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C.Cir.1994)). As this court has not found a single Second Circuit case addressing this issue, the legal viability of informational standing in this circuit is not clear. Regardless, it is clear that informational standing would not ap-

---

7. On March 8, 2000, the complaint was amended but this also occurred prior to the affiants' visits.

ply in this case even if this type of standing could be utilized in this circuit.

The concept of informational standing originates from a footnote in a 1973 opinion from Court of Appeals for the District of Columbia. *See Scientists' Inst. For Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1086–87, n. 29 (D.C.Cir.1973). Prior to 1991, the D.C. Circuit had held that informational harm could satisfy the injury-in-fact requirement of the test for standing. *See Citizens to End Animal Suffering and Exploitation, Inc. v. New England Aquarium*, 836 F.Supp. 45, 56 (D.Mass.1993) (citing cases). However, in *Foundation on Economic Trends v. Lyng*, the Circuit reviewed the development of the doctrine and cast considerable doubt about the scope of informational standing. 943 F.2d 79 (D.C.Cir.1991).[8]

In *Lying*, the Circuit observed that claims of an informational injury were inconsistent with the requirement that a plaintiff have more than "a mere interest in a problem."*See Lyng*, 943 F.2d at 85 (*quoting Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972)); *see also New England Aquarium*, 836 F.Supp. at 57; *Watkins*, 794 F.Supp. at 398. The Circuit also warned against an expansive view of informational injury claims where statutes, such as NEPA, provide for the preparation of public information. *See Lyng*, 943 F.2d at 85 (if an informational injury alone were sufficient, a plaintiff could acquire standing in any case by requesting that an agency prepare an EIS as required by NEPA, which would prompt an to "engage in 'agency action' by failing to honor the request"). The Circuit further contemplated that standing based upon an informational injury alone "would potentially eliminate any standing requirement in NEPA cases, save when an organization was foolish enough to allege that it wanted the information for reasons having nothing to do with the environment." *Id.* at 84. For these reasons, the Circuit clearly indicated that informational standing alone cannot be a sufficient basis to establish an organization's standing. *See Id.* ("we have never sustained an organization's standing in a NEPA case solely on the basis of 'informational injury' . . .").

Despite its lengthy dissertation on informational standing, the Circuit, nonetheless, did not decide whether an organization could relying on an informational injury to establish standing. Instead, it found that plaintiffs lacked standing because they had "fail[ed] 'to target their complaint to a particular proposal for federal action and fail[ed] to identify any [action] . . . that would trigger the obligation to prepare an environmental impact state-

8. To support its an informational standing position, plaintiff relies, *inter alia*, upon *Federal Election Commission v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). At issue in *Akins* was a decision by the Federal Election Commission finding that a lobbying group was not a political action committee under federal law. For this reason, information regarding members and campaign contributions made by the group was not disclosed to the public. Reviewing this decision, the Supreme Court held that voters' inability to obtain this sort of information satisfied the "injury in fact" requirement for Article III standing.

In the instant case, plaintiff argues that the *Akins* decision clearly shows that allegations of an informational injury constitutes an injury in fact sufficient to establish standing. The court disagrees. *Akins* arose in the special context of voters' rights, and its holding was affected by the fact that the alleged informational injury was directly related to the core constitutional right to vote. *See Alaska State Snowmobile Ass'n v. Babbitt*, 79 F.Supp.2d 1116, 1128 (D.Alaska 1999). As this case does not implicate such a hallowed constitutional right, it more appropriate to rely upon the precedent established in *Lyng*.

ment under NEPA." *Id.* at 86. In the instant case, plaintiff argues that under the standard articulated in *Lyng* it can establish its informational standing if it prevails on the merits of its NEPA claims. Although this position seems counterintuitive, *Lyng* decision acknowledges that the standard it promulgates tends to merge standing under the APA with the merits of a NEPA claim. *See Id.* at 85; *see also Public Citizen v. United States Trade Representative,* 782 F.Supp. 139, 143 (D.D.C.1992).

■ Even though *Lyng* seems to support plaintiff's position, this court rejects plaintiff's belief that it can establish standing with its success on the merits. The doctrine of standing is intended to ensure that a plaintiff has an interest in the litigation at the outset of suit. For this reason, standing must be established in the beginning rather than end of litigation. *See Cook v. Colgate Univ.,* 992 F.2d at 19. If the court were to adopt plaintiff's position, it would effectively ignore this fundamental maxim of long established jurisprudence. The court declines to take such a position without instruction from the Second Circuit.

Regarding informational standing itself, it is clear that the notion of informational harm, without more, does not confer standing in a NEPA case as it is inconsistent with the requirement of establishing concrete and particularized harm. *See New England Aquarium,* 836 F.Supp. at 58 (*citing Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2137). To hold otherwise would allow organizational plaintiffs, like Atlantic States, to undermine the established principals of standing in NEPA

cases by simply requesting that an agency prepare an EIS. Therefore, in order for plaintiff in the instant case to establish standing it must show more than an informational injury to its members. As the only injury suffered by plaintiff's members seems to originate from the failure to produce an EIS, the court finds that Atlantic States lacks standing to pursue its claims. Accordingly, all of plaintiff's claims under NEPA, the APA and the MTBA are hereby dismissed for lack of standing.[9]

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED,** that defendant Babbitt's motion for summary judgment is **GRANTED.** It is further

**ORDERED,** that defendant Cahill's motion for summary judgment is **GRANTED.** It is further

**ORDERED,** that plaintiff's cross-motion for summary judgment is **DENIED** as moot. It is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order upon the parties by regular mail.

---

**9.** Although not specifically discussed by the litigants, it stands to reason that plaintiff also lacks standing to maintain its MBTA claims for the reasons articulated herein. Therefore, these claims are also dismissed for lack of standing.