[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 290 
HealthSouth Corporation petitions this Court for a writ of mandamus directing the Jefferson Circuit Court to enter a summary judgment in its favor on the ground that General Medicine, P.C., has no standing to bring the underlying action against it. Because HealthSouth has not demonstrated a clear legal right to the remedy it seeks, we deny the petition.
 Factual and Procedural History
General Medicine is a Michigan-based professional corporation consisting of physicians and advanced nurse practitioners who specialize in geriatrics and subacute and long-term care. General Medicine entered into a contract with Horizon/CMS Healthcare Corporation ("Horizon") pursuant to which General Medicine was to provide medical services at Horizon's long-term care facilities. In 1996, General Medicine brought a breach-of-contract action against Horizon in the United States *Page 291 
District Court for the Eastern District of Michigan. The district court stayed the action from 1998 until 2003.
In February 1997, HealthSouth, a Delaware corporation with its principal place of business located in Birmingham, Alabama, acquired Horizon, paying $1.25 billion to purchase Horizon's stock. From 1997 until 2001, Horizon was a wholly owned subsidiary of HealthSouth. In November 1997, HealthSouth sold Horizon's long-term care facilities to Integrated Health Services, Inc. ("IHS"), for $1.25 billion; as a result of the sale, Horizon received $1.15 billion in cash and IHS assumed $100 million of Horizon's debt. According to General Medicine, "HealthSouth accounted for the IHS sale on Horizon's books and records by recharacterizing $414 million of fictitious earnings from a previous transaction as an asset sold to IHS"; HealthSouth then transferred $500 million of the cash proceeds from the sale from Horizon to itself and "replac[ed] the cash on Horizon's balance sheet with a fictitious asset to offset the cash transfer." General Medicine's answer at 3-4. In November 2001, HealthSouth sold its shares of Horizon stock to Meadowbrook Healthcare, Inc., for $16.8 million. Thus, according to General Medicine, "HealthSouth fraudulently stripped more than $1 billion in assets from Horizon." General Medicine's answer at 4.
In April 2004, General Medicine entered into a settlement agreement in the federal litigation with Horizon and its owner, Meadowbrook. As part of the settlement, Meadowbrook and Horizon paid General Medicine $300,000 and consented to a judgment in the federal district court in which Horizon admitted liability in the amount of $376 million.[1] General Medicine reserved its right to receive any payment "awarded or returned to Horizon or Meadowbrook as a result of any action brought by Gen[eral] Med[icine] against HealthSouth Corporation to execute on the Consent Judgment." However, General Medicine covenanted not to execute on the consent judgment against Meadowbrook or Horizon beyond the $300,000 provided for in the agreement. General Medicine's answer, tab C at 6. The settlement agreement also provided that the settlement
 "is not releasing Horizon and/or Meadowbrook from liability to Gen[eral] Med[icine] arising out of the Lawsuit or the Consent Judgment, and that this agreement does not affect Gen[eral] Med[icine]'s rights or claims against any other person or nonparty to this agreement."
General Medicine's answer at 7.
General Medicine filed the instant action in the Jefferson Circuit Court in August 2004, alleging that it was a creditor of Horizon and that assets had been fraudulently transferred from Horizon to HealthSouth. HealthSouth moved for a summary judgment, arguing that General Medicine had no standing to bring this action because it was not a "creditor" of Horizon under the Alabama Uniform Fraudulent Transfer Act ("AUFTA"), § 8-9A-1
et seq., Ala. Code 1975. The trial court denied the summary-judgment motion. HealthSouth then filed a motion for reconsideration and, alternatively, a motion for the trial court to certify its order for interlocutory appeal pursuant to Rule *Page 292 
5, Ala.R.App.P. The trial court denied both motions. HealthSouth now petitions for a writ of mandamus directing the trial court to enter a summary judgment in its favor. In July 2006, this Court ordered answer and briefs and stayed the proceeding in the trial court in order to consider the petition.
 Standard of Review
Mandamus review is available where the petitioner challenges the subject-matter jurisdiction of the trial court based on the plaintiff's alleged lack of standing to bring the lawsuit.
 "'"`Mandamus is a drastic and extraordinary writ, to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.' Ex parte Integon Corp., 672 So.2d 497, 499 (Ala. 1995). The question of subject-matter jurisdiction is reviewable by a petition for a writ of mandamus. Ex parte Flint Constr. Co., 775 So.2d 805 (Ala. 2000)."
 "`Ex parte Liberty Nat'l Life Ins. Co., 888 So.2d 478, 480 (Ala. 2003) (emphasis added). "When a party without standing purports to commence an action, the trial court acquires no subject-matter jurisdiction." State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1028 (Ala. 1999). Under such a circumstance, the trial court has "no alternative but to dismiss the action." 740 So.2d at 1029.'"
Ex parte Richardson, 957 So.2d 1119, 1124 (Ala. 2006) (quoting Ex parte Chemical Waste Mgmt, Inc.,929 So.2d 1007, 1010 (Ala. 2005)).
This petition follows the denial of a motion for a summary judgment. To grant a motion for a summary judgment, the trial court must determine that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala.R.Civ.P. When the movant makes a prima facie showing that those two conditions are satisfied, the burden then shifts to the nonmovant to present "substantial evidence" creating a genuine issue of material fact. Exparte CSX Transp., Inc., 938 So.2d 959, 961 (Ala. 2006). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989); § 12-21-12(d), Ala. Code 1975.
In our review of a ruling on a motion for a summary judgment, we apply as to factual issues the same standard as does the trial court. Ex parte Lumpkin, 702 So.2d 462, 465
(Ala. 1997). We must review the record in the light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Ex parte CSX Transp.,938 So.2d at 962. The trial court's ruling on a question of law carries no presumption of correctness. Ex parte Graham,702 So.2d 1215, 1221 (Ala. 1997).
 Analysis
HealthSouth argues that General Medicine lacked standing to bring its claim under the AUFTA. According to HealthSouth, General Medicine's covenant not to sue released Horizon from liability, thereby extinguishing the debt and divesting General Medicine of its status as a creditor and, therefore, of standing under the AUFTA. General Medicine argues that it is, as a matter of law, a creditor as that *Page 293 
term is defined by the AUFTA, and that, at a minimum, the settlement agreement creates disputed questions of fact.
To demonstrate standing, General Medicine must show "(1) an actual concrete and particularized `injury in fact' — `an invasion of a legally protected interest'; (2) a `causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be `redressed by a favorable decision.'" Stiff v. Alabama Alcoholic BeverageControl Bd., 878 So.2d 1138, 1141 (Ala. 2003) (quotingLujan v. Defenders of Wildlife, 504 U.S. 555, 560-61,112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). It must allege "specific concrete facts demonstrating that the challenged practices harm [it], and that [it] personally would benefit in a tangible way from the court's intervention." Warth v.Seldin, 422 U.S. 490, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343
(1975) (footnote omitted).
The AUFTA provides a remedy for a creditor who alleges that a debtor has fraudulently transferred assets in order to avoid satisfying the debt. § 8-9A-1 et seq., Ala. Code 1975. "`[F]raudulent conveyances may be attacked only by a party who is injured or damaged by the conveyance, and a stranger to the transaction who is neither a creditor [n]or a purchaser or otherwise affected has no standing to maintain the action.'"Woodard v. Funderburk, 846 So.2d 363, 366
(Ala.Civ.App. 2002) (quoting Jesse P. Evans, Alabama PropertyRights and Remedies § 31.7(a) at 543 (2d ed.1998)).
The AUFTA defines a "creditor" as one who has a "claim." §8-9A-1(4), Ala. Code 1975. The statute defines a "claim" as "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. . . ." § 8-9A-1(3), Ala. Code 1975. A "debtor" is "[a] person who is liable on a claim," § 8-9A-1(6), Ala. Code 1975, and a "debt" is defined as "[l]iability on a claim." §8-9A-1(5), Ala. Code 1975. If General Medicine does not fit within the definition of a creditor in the statute, then it lacks standing to bring an action under the AUFTA.Woodard, 846 So.2d at 366 ('"[A] fraudulent conveyance is valid as to all the world except creditors of the grantor.'" (quoting Bank of Lexington v. Jones, 456 So.2d 784, 785
(Ala. 1984) (interpreting the predecessor statute to AUFTA))).
HealthSouth first argues that there is no disputed question of fact that would preclude the trial court from entering a summary judgment in HealthSouth's favor. General Medicine disagrees, but it does not put forward any evidence other than the settlement agreement itself. General Medicine merely asserts that "at worst, the Settlement Agreement evinces a question of fact as to General Medicine's status as a creditor that should be submitted to the jury." General Medicine's answer at 11. The settlement agreement, on its face, does not appear ambiguous or otherwise raise a genuine issue of material fact, and General Medicine fails to point out any ambiguity or issue of fact created by the settlement agreement.
Because there is no genuine issue of material fact, we turn to the question whether HealthSouth is entitled to a summary judgment as a matter of law. This Court has stated: "`"The construction of a written document is a function of the court. If the document is unambiguous, its construction and legal effect are a question of law which may be decided under appropriate circumstances, by summary judgment."'" Boggan v.Waste Away Group, Inc., 585 So.2d 1357, 1359-60 (Ala. 1991) (quoting Jehle-Slauson Constr. Co. v. Hood-Rich, Architects Consulting Eng'rs, 435 So.2d 716, 720 (Ala. 1983), quoting *Page 294 
in turn Wheeler v. First Alabama Bank of Birmingham,364 So.2d 1190, 1194 (Ala. 1978)); see also Baldwin v.Branch, 888 So.2d 482, 484 (Ala. 2004) ("When a document is unambiguous, its construction and legal effect are questions of law for the court to decide."). Further, the Court may use established rules of contract construction to attempt to resolve as a matter of law any ambiguity found within the four corners of the document. Alfa Life Ins. Corp. v. Johnson,822 So.2d 400, 405 (Ala. 2001) ("[I]f the trial court finds the contract to be ambiguous, it `must employ established rules of contract construction to resolve the ambiguity.'" (quotingVoyager Life Ins. Co. v. Whitson, 703 So.2d 944, 948
(Ala. 1997))); see also Vesta Fire Ins. Corp. v. LibertyNat'l Life Ins. Co., 893 So.2d 395, 404 (Ala.Civ.App. 2003) ("In short, a court is to evaluate the contract on its face and apply rules of contract construction in an effort to resolve ambiguities before submitting the case to a jury.").
General Medicine agreed in paragraph 4 of the settlement agreement that it
 "(i) will not enforce, execute against or attempt to collect in any fashion from Horizon and/or Meadowbrook as a result of or under the Consent Judgment, beyond the amounts identified in paragraph 6(i.) [$300,000]; and (ii) will not execute against or attempt to collect in any fashion from Horizon and/or Meadowbrook as a result of or under the Consent Judgment, beyond the amounts identified in paragraph 6(i.)[2] below; and (iii) will not commence another lawsuit against Horizon and/or Meadowbrook for anything occurring prior to the date of this agreement."
General Medicine's answer, tab C at 2. The only difference between clauses (i) and (ii) is that the phrase "not enforce" is omitted from clause (ii); therefore, clause (ii) appears largely redundant.
General Medicine has not argued that the settlement agreement does not represent the intentions of the parties. According to its terms, the agreement bars General Medicine from suing Horizon or Meadowbrook for any money owed on the consent judgment in excess of the $300,000 referenced in paragraph 6(i).
HealthSouth argues that the covenant not to sue found in paragraph 4 of the settlement agreement operates to release Horizon from liability because, it argues, the covenant prevents General Medicine from suing to collect any amount beyond the $300,000 provided for in the settlement agreement, and it is undisputed that General Medicine has received that amount. HealthSouth argues that "'[w]ithout a debt enforceable against the transferor, a creditor has no claim against the transferee. `"HealthSouth's brief at 14 (quoting Jahner v. Jacob,515 N.W.2d 183, 185 (N.D. 1994)).
General Medicine acknowledges that the settlement agreement contained a covenant not to sue and notes that the express language in paragraph 5 of the agreement states that the argument is "not a release" *Page 295 
and that General Medicine is "not releasing Horizon and/or Meadowbrook from liability . . . arising out of the Lawsuit or the Consent Judgment. . . ." General Medicine's answer, tab C at 2. General Medicine also relies on paragraph 6.ii. as the basis of its claiming status as a creditor of Horizon, contending that this paragraph creates an obligation owed by Horizon separate from the covenant not to sue. Paragraph 6.ii. provides:
 "The payment, conveyance, assignment or transfer by Horizon and/or Meadowbrook to Gen[eral] Med[icine], upon receipt, of any assets or property, of any kind or nature, awarded or returned to Horizon or Meadowbrook, as a result of any action brought by Gen[eral] Med[icine] against HealthSouth Corporation to execute on the Consent Judgment as long as Gen[eral] Med[icine] is not in breach of its obligations under paragraph 8(vi.) herein."
General Medicine's brief at 18. Under the settlement agreement, any payment Horizon or Meadowbrook receives as a result of litigation brought by General Medicine against HealthSouth to collect on the consent judgment would be owed to General Medicine.
General Medicine contends that Michigan law governs the effect of the covenant not to sue. HealthSouth has not argued that Michigan law does not apply, although it analyzes the issue under both Michigan and Alabama law. The settlement agreement contains a choice-of-law clause that states that Michigan law will govern the interpretation of the contract. Moreover, "[i]n a contractual dispute, Alabama law would have us first look to the contract to determine whether the parties have specified a particular sovereign's law to govern." Stovall v. UniversalConstr. Co., 893 So.2d 1090, 1102 (Ala. 2004); see alsoPolaris Sales, Inc. v. Heritage Imports, Inc.,879 So.2d 1129, 1133 (Ala. 2003) ("'Alabama law has long recognized the right of parties to an agreement to choose a particular state's laws to govern an agreement.'" (quoting Cherry, Bekaert Holland v. Brown, 582 So.2d 502, 506 (Ala. 1991))). Therefore, we apply Michigan law to determine whether the covenant not to sue operates as a release of liability.
Michigan law distinguishes between a release and a covenant not to sue:
 "A release immediately discharges an existing claim or right. In contrast, a covenant not to sue is merely an agreement not to sue on an existing claim. It does not extinguish a claim or cause of action. The difference merely affects third parties, rather than the parties to the agreement."
J J Farmer Leasing, Inc. v. Citizens Ins. Co. ofAmerica, 472 Mich. 353, 357-58, 696 N.W.2d 681, 684 (2005). Thus, as between the parties, a covenant not to sue operates as a release. Industrial Steel Stamping, Inc. v. Erie StateBank, 167 Mich.App. 687, 693, 423 N.W.2d 317, 320 (1988) ("As between the parties to the agreement, the result [of a covenant not to sue or a release] is the same.").
Michigan law requires the court to look to the language of the contract and to the intentions of the parties to determine the scope of a release. See Adair v. State, 470 Mich. 105,127, 680 N.W.2d 386, 399 (2004) ("The scope of a release is controlled by the language of the release, and where, as here, the language is unambiguous, we construe it as written.");Cole v. Ladbroke Racing Michigan, Inc.,241 Mich.App. 1, 13, 614 N.W.2d 169, 176 (2000) ("The scope of a release is governed by the intent of the parties as it is expressed in the release."). The settlement agreement before us provides that it is a covenant not to sue and not a release; the agreement states that General Medicine *Page 296 
"will not enforce, execute against[,] or attempt to collect" under the consent judgment and that it "will not commence another lawsuit" against Horizon or Meadowbrook. General Medicine's answer, tab C at 2. Further, the agreement states that General Medicine
 "is not releasing Horizon and/or Meadowbrook from liability to Gen[eral] Med[icine] arising out of the Lawsuit or the Consent Judgment, and that this agreement does not affect Gen[eral] Med[icine]'s rights or claims against any other person or nonparty to this agreement."
General Medicine's answer at 7.
Although the operation and effect of a covenant not to sue and that of a release may be the same as between the parties to the agreement, a covenant not to sue does not extinguish the underlying cause of action; it merely prohibits a party from pursuing it. J J Farmer Leasing,472 Mich. at 357-58, 696 N.W.2d at 684. In short, under Michigan law, because the breach-of-contract cause of action was not extinguished, General Medicine preserved its right to enforce the consent judgment against other parties, including HealthSouth.[3]
HealthSouth cites cases that stand for the proposition that once the creditor can no longer enforce the debt against the debtor, the creditor has no claim against the transferee to whom assets have been transferred. In Harper v. Raisin FertilizerCo., 158 Ala. 329, 48 So. 589 (1908), this Court held that the defendant in a fraudulent-transfer action could raise a statute-of-limitations defense that was available to the debtor.Harper thus stands for the principle that the transferee in an action brought against it to unwind an allegedly fraudulent transfer may put forward defenses available to the transferor. Harper does not, however, support HealthSouth's argument that the existence of such defenses deprives the creditor of standing. When the statute of limitations expires, it does not extinguish the cause of action; instead, it makes the remedy unavailable. See Ex parteLiberty Nat'l Life Ins. Co., 825 So.2d 758, 765 (Ala. 2002) ("`[A] statute of limitations generally is procedural and extinguishes the remedy rather than the right. . . .'"). Further, the expiration of the statute of limitations does not affect the creditor's standing to bring the action because such an affirmative defense may be waived. See Rule 8(c), Ala.R.Civ.P. (stating that an affirmative defense based on the statute of limitations that is not put forward in the defendant's first pleading is deemed waived); State ofAlabama ex rel. State of Ohio v. E.B.M., 718 So.2d 669,670 (Ala. 1998) ("The defense of the statute of limitations must be affirmatively pleaded, and if an answer does not include an affirmative defense, that defense is deemed to have been waived."). Thus, Harper does not require this Court to hold that the fact that a claim is for some reason barred divests a party of standing.
HealthSouth supports its position with Jahner v.Jacob, 515 N.W.2d 183, 185 (N.D. 1994), in which the Supreme Court of North Dakota stated that "the claimant loses her status as a creditor if her claim against the transferor becomes barred by *Page 297 
the statute of limitations, a non-claim statute, or other method. Without a debt enforceable against the transferor, a creditor has no claim against the transferee." (Citations omitted.) The rationale for this holding was, in part, that in North Dakota "[t]he effect of setting aside a fraudulent transfer of property is to revest title in the debtor."Jahner, 515 N.W.2d at 185. The North Dakota court concluded that "`surely the [Uniform Act] does not contemplate the absurdity of granting such relief where, as here, judgment cannot be obtained against the only party in whom the transferred property could be revested.'" (Quoting Laidleyv. Heigho, 326 F.2d 592, 593-94 (9th Cir.1963).)
Other jurisdictions, however, hold that title does not revest in the debtor where a court sets aside a fraudulent transfer.See Roth-Zachry Heating, Inc. v. Price,77 Or.App. 382, 387, 713 P.2d 634, 637 (1986) ("In essence, the effect of the judgment is to hold the transfer void only as to creditors but to recognize it as binding on the parties involved.");West v. Baker, 109 Ariz. 415, 417, 510 P.2d 731, 733
(1973) (noting that, under Texas and Arizona law, "`[a] creditor's judgment subjecting property fraudulently conveyed by his debtor to the payment of his debt does not have the effect of reinvesting title in the fraudulent vendor.'" (quotingJohn Hancock Mut. Life Ins. Co. v. Morse, 132 Tex. 534,539, 124 S.W.2d 330, 333 (Com.App. 1939))).
Alabama law is consistent with that of those jurisdictions that hold that the effect of setting aside a fraudulent transfer is not to revest title in the debtor. This Court has held that "a conveyance or transfer made to hinder, delay, or defraud creditors is valid and operative between the parties when it has been fully consummated; after it is fully consummated, neither party can rescind it." Hill v. Farmers Merchants Bankof Waterloo, 641 So.2d 788, 790 (Ala. 1994). Thus, in Alabama, a court's setting aside of a fraudulent transfer does not revest title in the debtor. Instead, the transferee continues to own the fraudulently transferred assets; the transfer is void only as to the creditor, and the creditor can execute on those assets directly. § 8-9A-7(b), Ala. Code 1975 ("If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds."). In this case, the covenant not to sue Horizon does not prevent General Medicine from executing against the allegedly fraudulently transferred assets currently in HealthSouth's possession.
General Medicine's "right to payment" has not been extinguished because, under Michigan law, the settlement agreement did not vacate the consent judgment. Although the settlement agreement would prevent General Medicine from attempting to collect against assets currently in Horizon's possession, it did not extinguish Horizon's liability as to its assets that were allegedly fraudulently conveyed.
HealthSouth contends that General Medicine nonetheless lacks standing because, "[a]s a matter of law and logic, General Medicine's standing to bring this AUFTA action cannot be based on an alleged right to payment that will exist only if this AUFTA action is allowed to proceed to a successful conclusion as if General Medicine had standing from the beginning. . . ." HealthSouth's reply brief at 5. HealthSouth cites SierraClub v. Hawaii Tourism Authority, 100 Haw. 242, 257,59 P.3d 877, 892 (2002), for the proposition that "`[s]tanding must be established in the beginning rather than end of litigation'" (quoting Atlantic States Legal Found, v.Babbitt, 140 F.Supp.2d 185, 194 (N.D.N.Y.2001)). The Supreme Court of Hawaii's holding in Sierra Club, however, was based on the plaintiff's failure to demonstrate an injury in fact and redressability. *Page 298 
The court held that the alleged injuries the plaintiff had suffered — informational injuries[4] and the increased likelihood of an erroneous decision — were conjectural and hypothetical. The court further held that, because the plaintiff had no right to certain procedures, any injury that followed from the deprivation of those procedures was not redressable.Sierra Club, 100 Haw. at 257, 59 P.3d at 892. Unlike the Sierra Club, General Medicine has demonstrated an injury in fact that can be redressed by the courts: the allegedly fraudulent transfer of assets left Horizon without sufficient assets to pay the consent judgment, and the AUFTA provides a remedy to creditors in this situation.
Section 8-9A-7(b), Ala. Code 1975, allows a creditor who has obtained a judgment on a claim against the debtor to levy execution on the asset fraudulently transferred or on its proceeds. General Medicine has standing as a creditor of Horizon because it has a right to payment out of those assets allegedly fraudulently transferred to satisfy the consent judgment. For this reason, HealthSouth has failed to demonstrate a clear legal right to the relief it seeks.
 Conclusion
Because HealthSouth has failed to demonstrate a clear legal right to an order directing the trial court to enter a summary judgment in its favor, we deny its petition for the writ of mandamus.
PETITION DENIED.
COBB, C.J., and WOODALL, SMITH, and PARKER, JJ., concur.
[1] HealthSouth contends that the consent judgment in the federal action was the product of collusion, fraud, and bad faith and that the amount of Horizon's liability was greatly exaggerated. HealthSouth's brief at 5 n. 3. The question of HealthSouth's right to challenge the legality of the consent judgment when General Medicine attempts to execute on the allegedly fraudulently transferred assets is not before this Court on this mandamus petition.
[2] Paragraph 6.i. provides:
 "The consideration for this Agreement between Gen[eral] Med[icine], Horizon and Meadowbrook is the covenants contained herein, the Consent Judgment to be entered in the Lawsuit, the other agreements and provisions contained in this Agreement, and:
 "i. Horizon and/or Meadowbrook's payments to Gen[eral] Med[icine] of the total sum of Three Hundred Thousand ($300,-000.00) Dollars, payable by check(s) drawn in favor of General Medicine, P.C. or its designee and delivered not later than fourteen days following the entry of the Consent Judgment in the Lawsuit. . . ."
General Medicine's answer, tab C at 2.
[3] HealthSouth argues that, under Cook v. City TransportCorp., 272 Mich. 91, 261 N.W. 257 (1935), a party's covenant not to sue on a breach-of-contract claim amounts to a release because, it argues, the covenant not to sue supersedes the original contract and destroys it. Thus, according to HealthSouth, a covenant not to sue all parties to a contract effectively extinguishes the contract. However, Cook
distinguishes that rule, and it does not appear that any Michigan court has actually applied it in a century. Further, the Supreme Court of Michigan has more recently stated that a covenant not to sue does not extinguish a cause of action. J J Farmer Leasing, 472 Mich. at 357-58,696 N.W.2d at 684.
[4] This type of injury occurs in specific circumstances where a statutory provision explicitly creates a right to information. Atlantic States Legal Found.,140 F.Supp.2d at 192.